IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| ATM SHAFIQUL KHALID, an individual, and XENCARE SOFTWARE, INC., a Washington corporation,<br><br>　　　　　　Appellants,<br><br>v.<br><br>CITRIX SYSTEMS, INC., a Delaware corporation,<br><br>　　　　　　Respondent. | No. 79143-5-I<br>consolidated with No. 79405-1-I<br><br>No. 79145-1-I<br>consolidated with No. 79305-5-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |
| CITRIX SYSTEMS, INC.,<br><br>　　　　　　Appellant,<br><br>v.<br><br>ATM SHAFIQUL KHALID, and XENCARE SOFTWARE, INC.,<br><br>　　　　　　Respondents. | |

ANDRUS, A.C.J. — Software engineer ATM Shafiqul Khalid[1] sued his former employer, Citrix Systems, Inc., raising numerous claims, including breach of an employment agreement relating to the ownership of intellectual property Khalid

---

[1] "ATM" does not stand for any specific name and, according to Khalid, in Bangladesh, where Khalid was born, the letters are commonly used as part of people's names.

Citations and pin cites are based on the Westlaw online version of the cited material.

developed during his employment. Citrix countersued Khalid for breaching the same agreement and for trademark infringement under the Lanham Act, 15 U.S.C. §1114 *et seq.* based on Khalid's use of Citrix's "Xen" trademarks for his startup businesses.

On summary judgment, the trial court dismissed several of Khalid's claims and also found Khalid had infringed Citrix's trademarks. A jury subsequently found Citrix breached Khalid's employment agreement and severance agreement and awarded him over $3 million in damages. The jury found Khalid had not breached his employment agreement and awarded Citrix no damages on its trademark infringement claim.

In post-trial motions, the trial court awarded Khalid over $2.6 million in attorney fees and costs. It awarded Citrix $117,816 in legal fees and costs for prevailing in part on summary judgment on its trademark infringement counterclaim. The trial court also concluded, based on the jury's verdicts, that Citrix has no ownership interest in two of Khalid's patents and entered a declaratory judgment to that effect in Khalid's favor.

On appeal, Citrix and Khalid challenge a number of pretrial, trial, and post-trial decisions.[2] We conclude that the trial court erred in denying Khalid's request for prejudgment interest on the jury's $3 million damages award and erred in awarding attorney fees to Citrix on its trademark infringement claim. We remand with instructions to vacate the attorney fee award in favor of Citrix, to award prejudgment interest to Khalid as set out in this opinion, and to adjust Khalid's

---

[2] Although Xencare Software, Inc. was identified as an appellant in the notice of appeal, only Khalid assigned errors for our review in this appeal.

- 2 -

attorney fee award to eliminate compensation for work that does not relate to a common core of facts. In all other regards, we affirm the decisions of the trial court and the judgment entered on the jury's verdicts.

FACTS

Khalid's Education and Employment History

Khalid completed his undergraduate studies in computer science and engineering in Bangladesh, his country of origin, in 1995. After publishing multiple research papers in computer science journals and winning a national computer programming competition from the Bangladesh Computer Council, Khalid began graduate studies in the United States, completing a master's degree in computer engineering in 1998. That same year, he began working at Microsoft as a software design engineer, in its "kernel and architecture group," working on the nucleus of its Windows operating system.

In 2006, Khalid left Microsoft to join Citrix, an international technology company that provides desktop virtualization and networking services. Citrix hired Khalid to work in "Citrix Labs," the company's research and development group that functioned as a think tank responsible for the creation and development of new products.

Khalid's Inventions

Khalid has a lengthy history of developing patentable inventions, both for his employers and for his own, separate, business endeavors. The litigation with Citrix involves two such inventions.

The '637 Patent for the Mini-Cloud System

On July 15, 2014, the United States Patent & Trademark Office (USPTO) issued patent number 8,782,637 (the '637 Patent). This patent, entitled "Mini-Cloud System for Enabling User Subscription to Cloud Service in Residential Environment," is described as a system "to enable subscription or service model for computing infrastructure, software, and digital content."

Khalid described the '637 Patent as a system comprised of multiple components, including what Khalid called a "thin terminal" device, which is a small piece of computer hardware, similar to a Roku or an Apple TV USB device, paired with a software system to manage digital content subscription services. Khalid began developing the software subscription component of this system as early as in 1996 while still a graduate student. This component involved compressing software to allow users to download it from an online source, so the software seller could eliminate retail in-store sales. He filed a provisional patent application for the system to support a software subscription service in 2001.[3]

In 2007, he broadened the provisional patent application to include a framework and platform for incorporating a digital content subscription. In November 2009, Khalid filed yet another provisional patent application for a system and process to consolidate a DSL modem and small computer into an "access gateway," which

---

[3] Since 1995, the USPTO has offered inventors the option of filing a "provisional" patent application, designed as a lower-cost first patent filing. The application has a pendency lasting 12 months and an applicant must file a corresponding nonprovisional application or convert the provisional into a nonprovisional application during the 12-month pendency period to benefit from the earlier filing date. See USPTO, Provisional Application For Patent, https://www.uspto.gov/patents-getting-started/patent-basics/types-patent-applications/provisional-application-patent (last visited Nov. 5, 2020).

could connect to services to host a remote desktop. This home gateway system was, as Khalid described it, a method of combining and centrally managing one's cell phone, movie rentals, and internet services.

In January 2010, Khalid filed his next provisional patent application for "thin devices to deliver computing power." The thin device, described as like a Roku stick, was the hardware needed to control his prior software system inventions.

On November 22, 2010, he filed a nonprovisional patent application combining each of the components for which he had previously filed provisional applications. This application is what culminated in the issuance of the '637 Patent.

Khalid initially formed a company he called KrisanTech in 2000 to develop and market the subscription component of what later became his mini-cloud system. He prepared a business plan for KrisanTech in 2006 when he began exploring how to attract venture capital for his startup company outside of Microsoft. He later began using the name "PCXen" as the name of the startup he intended to use to develop and market the mini-cloud system.

<u>The '219 Patent for Softlock Antivirus Software</u>

On October 9, 2012, the United States Patent & Trademark Office (USPTO) issued patent number 8,286,219 (the '219 Patent) to Khalid. This patent, entitled "Safe and Secure Program Execution Framework," is described as a system and method for ensuring that any instructions executing on a computer are certified and secure. Khalid testified that the patent covers a type of antivirus software based on "whitelisting," a process of certifying secure applications permitted access to a

computer, as compared to "blacklisting," the then-prevalent antivirus methodology of maintaining a list of unsecure applications to be blocked.

Khalid filed a provisional patent application for this invention in 2005, prior to working for Citrix. He allowed the application to lapse, but after working on the software code and testing it on his own time and using his own resources, he filed a second, nonprovisional patent application for the invention on February 16, 2008. The 2008 application was identical to the 2005 provisional one he had filed, with the exception of one additional improvement.

By 2008, Khalid had a functional software security product that he named "Softlock." Khalid founded a company he called "XenCare Software," purchased the expired domain name of www.xencare.com, and developed a website for the company. In September 2008, he issued a press release announcing the release of Softlock 2.0, described as a "lightweight and powerful protection [system] for Windows computers." Khalid testified that thousands of users downloaded free trial copies of Softlock 2.0. He later assigned the '219 Patent to Xencare, a company he formally incorporated in late 2011.

Khalid's Employment Agreement with Citrix.

When Khalid began working for Citrix in 2006, it asked him to execute a document entitled "Non-Solicitation, Non-Compete and Confidentiality and Employee Non-Disclosure Agreement" (Employment Agreement). Section 7 of the Employment Agreement, entitled "Disclosure and Assignment of Inventions" ("Invention Assignment Clause"), provides:

> If at any time during the term of my employment by Citrix, I . . . make, conceive, discover or reduce to practice any invention, . . . or

> intellectual property right . . . (hereinafter called "Developments") <u>that</u> (i) <u>relate to the business of Citrix</u> . . .; (ii) result, directly or indirectly, from tasks, duties and/or responsibilities assigned to me by Citrix; or (iii) <u>result, directly or indirectly, from the use of premises or personal property</u> (whether tangible or intangible) owned, leased or contracted for by Citrix, <u>such Developments</u> and the benefits thereof <u>shall be considered work made for hire</u>[4] <u>and shall immediately become the sole and absolute property of Citrix and its assigns</u>. . . .
> <u>If any of the Developments may not, by operation of law</u> or otherwise, <u>be considered work made for hire</u> by me for Citrix, or if ownership of all right, title, and interest of the intellectual property rights therein shall not otherwise vest exclusively in Citrix, <u>I hereby assign to Citrix</u>, and upon the future creation thereof automatically assign to Citrix, without further consideration, <u>the ownership of all such Developments.</u> . . . Upon disclosure of each of such Developments to Citrix, I agree during the term of my employment and at any time thereafter, at the request and cost of Citrix, to sign, execute, make and do all such deeds, documents, acts and things as Citrix may reasonably require to perfect and protect all interests therein. (Emphasis added).

The Invention Assignment Clause required Khalid to disclose all developments "made or conceived" prior to employment by Citrix on "Exhibit B" to the Employment Agreement. Developments identified in Exhibit B were "excluded from and shall not be assigned to Citrix."

Khalid listed twelve works he claimed to have conceived before joining Citrix in his Exhibit B. These included:

> 7. Safe and secure program execution framework.
> 8. A home communication Gate Way to combine different consumers[] needs like cell phone, movie rental, internet services etc.
> 9. A method and system to support subscription based software service.
> 10. A method and system to support software distribution replacing existing retail distribution network.

---

[4] A "work made for hire" is a term defined in the Copyright Act of 1976, 17 U.S.C. § 101 as "a work prepared by an employee within the scope of his or her employment." <u>Warren v. Fox Family Worldwide, Inc.</u>, 328 F.3d 1136, 1140 (9th Cir. 2003).

- 7 -

Khalid testified that number 7 referred to the antivirus software system he invented and later patented in the '219 Patent. Number 8 was intended to cover the invention he submitted for patent protection in his 2009 provisional application. And the invention set out in number 9 is what Khalid described in his 2001 provisional patent application. The work described in number 10 was described in the KrisanTech business plan from 2006 and included in Khalid's extended 2007 provisional patent application.

According to Khalid, both the software system covered by the '219 Patent and all four components of the mini-cloud system covered by the '637 Patent—the thin terminal, the access gateway, the digital content, and the subscription service—were disclosed to Citrix before he began working for the company.

Khalid also added an additional paragraph to the Invention Assignment Clause:

> This covenant not to complete is not applicable for working for Microsoft corp. or any company that develops the similar product Microsoft has developed <u>or continuation work of the items listed in Exhibit B</u>. (Emphasis added).

Khalid added this language to make it clear that he was allowed to continue working on his own inventions while employed with Citrix.

Khalid signed and returned the modified Employment Agreement, with the accompanying Exhibit B, to Abolfazl Sirjani, his supervisor at the time he began working at Citrix, on September 11, 2006. According to Khalid, he called out to Sirjani the inventions he listed in Exhibit B and the additional language he added to the Invention Assignment Clause and indicated via email that he intended to continue developing his inventions. Khalid testified he would not have accepted the offer from

Citrix if it meant he could no longer work on his outside research projects. Sirjani acknowledged receipt of the Exhibit B and informed Khalid that the company legal department would contact him if they had questions about his invention disclosure. No one from Citrix's legal department ever raised questions or concerns to Khalid about the inventions he disclosed in the Employment Agreement.

The work Khalid did for Citrix was unrelated to any of the inventions he disclosed in Exhibit B. The first project he worked on was to work out bugs in Windows Vista to allow it to operate audio remote technology. Citrix never asked him to work on any of his personal inventions. And none of the work he did on his own inventions interfered with his ability to perform up to Citrix's expectations. Khalid received above average to extraordinary performance reviews and, at times, received discretionary bonuses based on the quality of his work.

Khalid's Search for Investors, including Citrix

Between 2006 and 2008, Khalid continued to work on completing the coding for his Softlock antivirus software and developing the various components to the mini-cloud system. He retained the services of coders in Bangladesh to assist him with this work. He transferred approximately $70,000 to a bank account in Bangladesh to fund his startup's work there. He built a prototype thin terminal device for the mini-cloud System. Khalid testified he used his own resources, worked on these independent projects on his own time, and did not allow the work to interfere with any of his assigned duties for Citrix.

After Khalid succeeded in completing a beta release of Softlock and once he had his mini-cloud prototype in hand, he knew he needed more capital to take the

product to the next phase. One of the companies he approached was Citrix. In March 2008, he asked Sirjani to lunch to discuss his inventions. Khalid showed Sirjani his KrisanTech business plan and described his idea of distributing software via subscriptions rather than through retail purchases. Sirjani testified these projects were "sort of related to Citrix," but he clearly understood Khalid had worked on them independently, and the projects were "something that he was doing outside his work." Sirjani told Khalid he would speak to Martin Duursma, the Vice President of Citrix Labs, but he also told Khalid that Citrix was unlikely to be interested in the security software. To Khalid's understanding, that ended the discussion.

The next interaction Khalid had with Citrix regarding his inventions occurred in November 2009, when Khalid spoke directly with Duursma regarding his independent startups. When Khalid described to Duursma his idea for a home virtualization system, Duursma asked Sirjani to review Khalid's intellectual property. Sirjani reported to Duursma that it had potential and was something he recommended Duursma discuss with Khalid.

Duursma invited Khalid to give him a presentation about his business ideas. Khalid prepared a set of slides to describe his mini-cloud system to Duursma, and carried computers from his home office to the Citrix conference room to use for this presentation. On November 16, 2009, Khalid presented the system under the name "XenDesk." He described the idea as a "virtual mobile desk" that a residential user could access in multiple ways. He proposed the idea as a possible joint venture between him and Citrix. He made it clear he was looking for venture capital for his startup company. At Duursma's request, Khalid forwarded his slides to Bill

DeForeest, Khalid's supervisor at that time, and gave DeForeest a separate presentation on November 23, 2009. Khalid was then asked to give his presentation to a Citrix product team lead by Michael Harries. At this meeting, Khalid testified he received "mixed feedback." Harries stated Citrix was uninterested in getting into any hardware product development. Brad Pedersen, Citrix's chief architect, also told Khalid that Citrix had previously looked at hardware proposals and had never been interested in investing in the past. At the end of these meetings, Duursma told Khalid he could continue to work on these inventions on his own time, at his own expense, and if he could subsequently prove that they worked, Citrix might be interested at that point.

Khalid assumed Citrix had no interest in his antivirus software, and he began soliciting investments from other colleagues and friends. In January of 2010, Khalid met with Quamrul Mina, a fellow engineer from Bangladesh who had been his college mentor. Mina was the co-founder of Pragma Systems, an Austin-based technology company that developed secure applications to connect computer terminals. Khalid demonstrated Softlock for Mina. Mina tested the software and believed it showed a lot of promise, as it was a new and different technology from anything else on the market. Mina concluded the software was "very mature" and "something we could take it to the marketplace." Based on this meeting, Mina testified that Pragma planned to invest $100,000 in Softlock, and would have purchased 50,000 copies of the software to sell to its customers.

Khalid continued to pursue an investment from Citrix for his mini-cloud system. In January 2010, Khalid prepared a video of the progress he had made to

share with Duursma. The video lead to a follow up presentation on March 1, 2010, to ask Citrix to invest. After the presentation, Harries indicated Citrix was not interested in making Khalid an offer. The following month, he approached Duursma again because he was running out of funding and was looking for an alternative source of funding. Duursma told Khalid, via email, that he was in the process of setting up an accelerator program the purpose of which would be to fund new ventures. Khalid met again with Duursma in July 2010 and Duursma recommended that Khalid set up a management team and to develop a budget and a timeframe for going to market with his mini-cloud system in anticipation of possible participation in the Citrix startup accelerator program.

Based on Duursma's recommendations, in July 2010, Khalid attempted to retain the services of Robert Kapela, an experienced software executive, to serve as CEO for the startup company for the mini-cloud system that Khalid was now calling PCXen. Kapela expressed interest in investing in the business, but stated that his willingness to become involved and to invest was contingent on Khalid having clear title to his developments.

Citrix launched its accelerator startup program at the end of 2010. The purpose was to provide funding to outside companies, so Citrix employees could not participate. If a Citrix employee wanted funding through the program, he or she would have to first stop working at Citrix. Duursma suggested to Khalid that he should apply to the program. Khalid arranged to meet with John McIntyre, the program director, in February 2011. McIntyre told Khalid that if he applied to the program, Citrix would be willing to invest $400,000 in his startup.

Shortly after this meeting occurred, Duursma told Khalid that because he was disclosing intellectual property to Citrix representatives, he should document his personal inventions to protect his intellectual property if he did in fact choose to leave Citrix. As Duursma requested, Khalid sent him an email in which he wrote:

> I just wanted to formally disclose few items I'm working on outside my Citrix work to pursue some funding through Citrix start-up accelerator program that would fund new ideas up to 400k to create a new business. I typically work at night and weekend to engage myself in those activities that doesn't affect my Citrix work in any way. Here are the areas I'm working on:
>
> 1. Mobile Application delivery – The idea was to build a solution that can help customer deploy mobile apps and manage mobile end points. There are many approaches to target that problem. My primary approach is to solve the issue using mobile device simulator/emulator. . . .
>
> 2. Thin terminal, composite devices to combine few computing functionalities in consumer H/W like Modem, PC, TV, etc. – I started this project in 2008 as an extension of my earlier project to enable rental based computing like sales force. I build some demo using open source projects and explored different related areas like some devices developed by N-computing and pano logic. This also targets many software pieces to make those devices and services practically achievable. I showed demo and progress to Bill/Martin/Brad P at different times in 2009 and 2010 for possible sponsorship/funding through Citrix.

Khalid testified that the intellectual property described in paragraph 2 of this email related to the mini-cloud system that he had demonstrated to Duursma and DeForeest. Duursma confirmed that he recognized this email as a disclosure by Khalid of product ideas he wanted to have considered for the accelerator program. Yet, Duursma never informed Khalid that these ideas could not be developed independently or that he believed they were products being developed by Citrix.

In June 2011, Khalid sent an email again to Pedersen making a second pitch regarding his antivirus software. At the bottom of this email, Khalid added a paragraph that read: "Disclosure: I have personal investment security company, XenCare, which is not in competition to Citrix . . . XenCare has few pending patents . . ." No one at Citrix objected to Khalid's use of the name XenCare.

Khalid's Termination and Severance Agreement

Citrix terminated Khalid's employment on October 3, 2011. According to DeForeest, Khalid was terminated for two reasons. First, the work on Microsoft-related projects that Khalid had been hired to perform was complete. Second, Khalid's job performance on other projects had declined and Khalid had increasing difficulty collaborating with other engineers or taking direction.

Citrix offered Khalid a severance package of $30,757, equivalent to eleven weeks of base pay. To receive the severance payment, Citrix required Khalid to sign a Severance and General Release Agreement ("Severance Agreement"), which stated: "the Company desires to extend certain separation benefits to Employee to assist Employee with the transition to new employment, and in return, Employee has agreed to release the Company from any claims arising from or related to the employment relationship." The Severance Agreement imposed on Khalid continuing obligations related to his employment at Citrix. For example, Khalid was required to keep the terms of the Severance Agreement confidential, to comply with all of the terms of the Employment Agreement, and to return all company property to Citrix. It also contained a broad release of claims against Citrix.

Accompanying the Severance Agreement was a "Termination Certificate," requiring Khalid to certify that he had disclosed to Citrix any and all intellectual property he had conceived or made under the Employment Agreement. Before executing the document, Khalid sent an email to Lisa Barney, a human resources representative at Citrix, certifying that he had previously disclosed all of his intellectual property as a part of his request to participate in the accelerator program. By email dated October 19, 2011, Khalid sent Barney a list of disclosures of all of the intellectual property he developed while employed with Citrix but which he believed remained his property. This included "XenCare Software," which he described as an entity he founded in 2007 or 2008, which had two pending patents. He also identified a "HomeCloud" system, which he described as the software and product ideas he had demonstrated to Duursma and Pedersen. Khalid told Barney that, based on his termination, he assumed Citrix had no interest in funding any of his inventions and would find alternative funding.

Khalid signed and returned the Severance Agreement on October 21, 2011. At the same time, he informed Citrix that the "HomeCloud" system he had mentioned was the same as the mini-cloud system he had demonstrated to Duursma, and that it was derivative of what he had excluded from the Invention Assignment Clause by way of Exhibit B to the Employment Agreement.

On October 25, 2011, Khalid received a letter from Kellan Ponikiewicz, Citrix's in-house intellectual property counsel. Ponikiewicz informed Khalid that Citrix believed it owned any intellectual property he created while employed at Citrix, as well as the xencare.com domain name and the XenCare company name. She

sought additional information regarding the intellectual property he claimed to own in his email to Barney. Khalid sent Ponikiewicz a detailed email explaining how he had listed all of the patented inventions owned by XenCare in Exhibit B of his Employment Agreement, and provided her with URL links to the patent applications for her to review. He further explained how he had purchased the xencare.com domain and felt that "XenCare" was not a trademark owned by Citrix. He explained how he had purchased the Xencare domain name before joining Citrix, that he had disclosed his use of this company name to several managers within Citrix as early as 2008. Khalid also provided Ponikiewicz with a copy of RCW 49.44.140, Washington's statute on assignment of employee invention rights, and asked her to evaluate Citrix's claim of ownership in light of this law. On October 30, 2011, Khalid provided Ponikiewicz with further information regarding the PCXen patent applications for the mini-cloud system and provided additional URL links to these applications.

At some point thereafter, Khalid spoke with Ponikiewicz on the phone and she told him he had to assign all of his inventions to Citrix. On November 13, 2011, Ponikiewicz demanded that Khalid cease using the name XenCare and PCXen and assign the XenCare domain name to Citrix. She also demanded that Khalid assign his patent applications to Citrix. She informed him that Citrix would not release any severance payment until he had done so.

On December 8, 2011, Rob Feldman, associate general counsel for litigation and employment at Citrix, sent Khalid an email re-asserting Citrix's right to Khalid's patent applications and again demanding that Khalid cease using the "Xen" family of names, including Xencare and PCXen. He told informed Khalid that if he did not

agree, Citrix would take legal action. He stated that Khalid's failure to assign the property to Citrix constituted a breach of the Severance Agreement, and Citrix would not release his severance payment.[5]

Citrix's demands impacted Khalid's ability to retain investment and management services for his startup companies. Citrix's claim of ownership to Softlock led Mina to pull Pragma's purchase offer. Kapela also declined involvement in PcXen and invested elsewhere.

The Lawsuit

In 2015, Khalid filed this lawsuit against Citrix. Khalid alleged violations of Washington's Consumer Protection Act (CPA), breach of contract, tortious interference, and breach of the duty of good faith and fair dealing. Khalid also sought a declaratory judgment that the Invention Assignment Clause was unenforceable under RCW 49.44.140 and that Citrix had no ownership rights to the '219 or '637 Patents. He also sought punitive damages under Florida law.[6]

Citrix filed a counterclaim against Khalid and a third-party complaint against Khalid's company, XenCare Software, Inc., alleging they were infringing Citrix's "Xen" trademark in violation of the Lanham Act, 15 U.S.C. §1114(1). Citrix also filed counterclaims against Khalid for breach of contract and unjust enrichment.

---

[5] Khalid returned to work for Microsoft in December of 2011. In 2015, when his employment at Microsoft was terminated, Microsoft requested Khalid assign his rights in the '219 and '637 patents to Microsoft. Khalid subsequently sued Microsoft to clear its claim of ownership to this intellectual property. That lawsuit remains pending.

[6] The Employment Agreement contained a choice of law provision providing that Florida law governed its construction and enforcement. The parties do not dispute that Florida law governs the breach of contract (and associated covenants) claims and the award of attorney fees, while Washington law governs violations of Washington law (the CPA claim, the wage claim, and the violation of the Invention Assignment Statute, chapter 49.44 RCW).

Pretrial Motions

Khalid moved for partial summary judgment claiming, among other things, that the Invention Assignment Clause was unenforceable because it violated RCW 49.44.140. Khalid also claimed that Citrix's actions violated the CPA because they constituted an unfair or deceptive act under RCW 19.86.020 and an unlawful restraint of trade under RCW 19.86.030.

Citrix filed a cross motion for summary judgment seeking the dismissal of all of Khalid's claims, including his request for punitive damages. Citrix also moved for partial summary judgment on its infringement claim, seeking a ruling that Khalid infringed its trademark in marketing his Softlock software.

The trial court granted in part Khalid's motion for summary judgment with regard to his CPA claim under RCW 19.86.020, finding as a matter of law that the Employment Agreement violated RCW 49.44.140 and was unfair in violation of RCW 19.86.020. However, it concluded that the "remedy for th[e] violation is to strike the offending language and amend the language to conform to the requirements of the statute." The trial court denied the remainder of Khalid's summary judgment motion, including ownership of the patents.

The trial court granted partial summary judgment in favor of Citrix on its Lanham Act claim, finding that Khalid had infringed on Citrix's trademarks. It reserved for trial the issue of whether Citrix had any recoverable damages. The trial court otherwise denied Citrix's motion for summary judgment.

Citrix later renewed its summary judgment motion, arguing that Khalid's restraint of trade claim should be dismissed because Khalid had no evidence that

Citrix had conspired with any other entity to harm competition. The trial court agreed and dismissed Khalid's RCW 19.86.030 claim. It also dismissed Khalid's request for punitive damages.

Trial

Khalid's and Xencare's remaining claims and Citrix's counterclaims proceeded to a jury trial in July 2018. The court summarized these claims for the jury:

- Khalid claimed Citrix breached the Employment and Severance Agreements
- Khalid claimed Citrix breached the covenant of good faith and fair dealing relating to these two agreements.
- Khalid claimed Citrix violated the CPA.
- Khalid and Xencare claimed Citrix tortuously interfere with their respective business expectancies.
- Citrix claimed Khalid breached both the Employment and Severance Agreements.
- Citrix claimed Khalid was unjustly enriched.
- Citrix claimed Khalid had infringed its trademark.

Jury Verdict

On August 1, 2018, the jury found Citrix breached the Employment Agreement and awarded Khalid $3 million in damages. The jury also found Citrix breached the Severance Agreement and awarded Khalid $67,994 in damages. The jury rejected the remainder of Khalid's and Xencare's claims. The jury also found against Citrix on every one of its counterclaims and awarded it no damages.

Post-Trial Motions

Both Citrix and Khalid filed post-trial motions regarding the jury's damage award. Citrix moved for remittitur pursuant to CR 59(a)(6) and (7) and RCW 4.76.030, arguing that both jury awards improperly included a prejudgment interest of twelve percent. Citrix contended that, under Florida law, the court, and not the

jury, must award the appropriate amount of interest. The trial court denied Citrix's motion for remittitur except as to Khalid's claim for breach of the Severance Agreement, for which it remitted damages to $30,757, the undisputed amount Citrix agreed to pay as severance.

Khalid requested prejudgment interest on the $3 million award starting on November 1, 2011, at a rate of twelve percent. The trial court denied Khalid's request, finding it could not ascertain a date of actual loss of lost profits. The trial court awarded prejudgment interest on the $30,757 award for breach of the Severance Agreement, from the date of that agreement, October 28, 2011, through the date of judgment. It awarded prejudgment interest at Florida's interest rate of 4.75 percent, rather than Washington's interest rate of 12 percent. The trial court also granted Khalid's requested declaratory relief, concluding that "Citrix has no ownership or other rights to or arising under US Patent No. 8,286,219 and 8,782,637."

The trial court awarded attorney fees and costs to Khalid under the Employment Agreement and RCW 49.48.030. Because the contingency case demanded "a high level of specialized skill and experience by Khalid's lawyers," and involved complex intellectual property law, employment law, and Florida contract law, it applied a multiplier of 1.75. The trial court awarded Khalid $2,642,972.67 in attorney fees and $170,743.19 in costs. The trial court awarded Citrix $110,608.50 in attorney fees and $7,207.49 in costs for prevailing on its Lanham Act claim.

ANALYSIS

Khalid and Citrix have raised multiple issues on appeal. Given the complexity of the issues, we will address them as they arose chronologically in the trial court, regardless of the party assigning error to the issue here.

1. Dismissal of Khalid's Restraint of Trade Claim

Khalid argues the trial court erred in dismissing his restraint of trade claim under RCW 19.86.030 on summary judgment. We disagree.

We review summary judgment de novo, engaging in the same inquiry as the trial court. Torgerson v. One Lincoln Tower, LLC, 166 Wn.2d 510, 517, 210 P.3d 318 (2009); Lybbert v. Grant County, 141 Wn.2d 29, 34, 1 P.3d 1124 (2000). Summary judgment is appropriate only if the pleadings, affidavits, depositions, and admissions on file demonstrate the absence of any genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. CR 56(c); Lybbert, 141 Wn.2d at 34. Whether a particular action gives rise to a CPA violation is reviewable as a question of law. Leingang v. Pierce County Med. Bureau, 131 Wn.2d 133, 150, 930 P.2d 288 (1997); State v. Living Essentials, LLC, 8 Wn. App. 2d 1, 14, 436 P.3d 857, 864, review denied, 193 Wn.2d 1040, 449 P.3d 658 (2019), and cert. denied, No. 19-988, 2020 WL 5882220 (U.S. Oct. 5, 2020).

RCW 19.86.030 provides that "[e]very contract, combination, in the form of trust or otherwise, or conspiracy in restraint of trade or commerce is hereby declared unlawful." Our Supreme Court has interpreted RCW 19.86.030 as

- 21 -

Washington's equivalent of section 1 of the Sherman Antitrust Act, 15 U.S.C.[7] State v. Black, 100 Wn.2d 793, 799, 676 P.2d 963 (1984). Federal courts have applied two tests to evaluate claims under section 1 of the Sherman Act, and Washington courts have adopted those tests to evaluate claims under 19.86.030.[8] Ballo v. James S. Black Co., Inc., 39 Wn. App. 21, 26, 692 P.2d 182 (1984). The first approach, the "rule of reason" test, "requires the factfinder to decide whether under all the circumstances of the case, the restricted practice imposes a reasonable restraint on competition." Id. Under this test, the court examines "facts peculiar to the business, the history of the restraint, and the reasons why it was imposed to determine the effect on competition in the relevant product market." In re Nat'l Football League's Sunday Ticket Antitrust Litig., 933 F.3d 1136, 1150 (9th Cir. 2019), cert. denied sub nom. Nat'l Football League v. Ninth Inning, Inc., 19-1098, 2020 WL 6385695 (U.S. Nov. 2, 2020) (internal quotation marks omitted) (quoting Nat'l Soc'y of Prof'l Eng'rs v. United States, 435 U.S. 679, 692, 98 S. Ct. 1355, 55 L. Ed. 2d 637 (1978)).

The second approach, the "per se" test, is premised on the principle that certain agreements or practices are so plainly anti-competitive and so lacking in any redeeming virtue that they are conclusively presumed illegal without further examination under the rule of reason test. Ballo, 39 Wn. App. at 26. The practices typically deemed unlawful per se are price fixing, group boycotts and tying

---

[7] 15 U.S.C. §1 provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

[8] The legislature expressly instructed courts to be guided by federal law in interpreting RCW 19.86.030. RCW 19.86.920.

arrangements.  Id.  When an agreement falls under one of these categories, "any explanation of why the act was done or what its effect might be in a particular case is of no consequence or materiality."  Id.  The Ninth Circuit currently still applies both tests to section 1 claims.  See Fed. Trade Comm'n v. Qualcomm Inc., 969 F.3d 974, 989 (9th Cir. 2020).

Khalid did not argue below or here that the Invention Assignment Clause violates the rule of reason test by being an unreasonable restraint on competition.  Instead, Khalid argues that because the Invention Assignment Clause violated RCW 49.44.140, it is a per se unlawful restraint of trade.  But nothing in the plain language of RCW 49.44.140 indicates that this was the legislature's intent.  In Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 105 Wn.2d 778, 786, 719 P.2d 531 (1986), our Supreme Court noted that the legislature has repeatedly identified conduct it deems to be per se CPA violations.  It concluded that "the Legislature, not this court, is the appropriate body to . . . [declare] a statutory violation to be a per se unfair trade practice."[9]  Id. at 787.

Citing Sheppard v. Blackstock Lumber Co., 85 Wn.2d 929, 540 P.2d 1373 (1975), Khalid argues that an unlawful invention assignment provision in an employment contract is analogous to an unlawful non-competition agreement, which constitutes a per se restraint of trade in violation of RCW 19.86.030.  But Sheppard does not control here.  In that case, an employee of Blackstock Lumber

---

[9] The legislature has made explicit CPA findings, for example, in the context of deeds of trust, Lyons v. U.S. Bank Nat'l Ass'n, 181 Wn.2d 775, 786 n. 5, 336 P.3d 1142 (2014) (RCW 61.24.135 lists some per se violations of the Deed of Trust Act that automatically constitute unfair or deceptive practices); and claims-handling regulations by insurers.  St. Paul Fire & Marine Ins. Co. v. Onvia, Inc., 165 Wn.2d 122, 129, 196 P.3d 664 (2008) (a violation of insurance regulations in chapter 284-30 WAC establish per se violation of CPA).

established a custom woodworking business and began directly competing with Blackstock. Id. at 930. Blackstock notified Sheppard that his business activities violated a provision of his retirement plan. Id. The plan provided that any equity vested in the plan would be forfeited "if the former Participant . . . engages in or enters the employment of any person . . . engaged in any business . . . in competition with . . . the business of [the] Company." Id. Sheppard contended this forfeiture provision was unenforceable as an impermissible restraint on trade. Id.

The court framed the question as whether the contractual provision was an illegal restraint of trade under article 12, section 22 of the state constitution and RCW 19.86.030. Id. at 931. It recognized that under the common law of contracts, "while contracts in general restraint of trade are void and unenforceable, contracts in partial restraint of trade may be enforced if reasonable." Id. at 931-32. The court adopted the approach of the Oregon Supreme Court, drawing an analogy between forfeiture provisions in profit-sharing retirement plans to non-competition clauses in employment agreements. Id. at 932 (citing Lavey v. Edwards, 264 Or. 331, 505 P.2d 342 (1973)). It held that the forfeiture clause in the Blackstock retirement plan was not void or invalid per se but had to be evaluated under Washington's well-established three-part reasonableness test applicable to non-competition agreements. 85 Wn.2d at 932-33. Under this test, a non-competition covenant is reasonable if it (1) is no greater than is required for the protection of the employer; (2) does not impose undue hardship on the employee; and (3) is not injurious to the public. Id. at 933.

- 24 -

The court deemed the Blackstock provision unreasonable as written because the clause prohibited any competitive activity anywhere, at any time, and the company presented no evidence to explain the precise factors that went into the company's decision that such an unlimited non-competition prevision was necessary to protect its business interests. Id. at 933.

Sheppard does not support Khalid's statutory claim under RCW 19.86.030 claim for several reasons. First, the Sheppard court did not conclude that an invention assignment agreement that violates RCW 49.44.140 is a per se violation of RCW 19.86.030, entitling an employee to treble damages under RCW 19.86.090 or civil penalties under RCW 19.86.140. The Sheppard court remanded the case for a trial to determine "what extent, if any, the forfeiture provision provides a reasonable restraint and to what extent it may be enforceable." Id. at 934.

Second, if, as Sheppard holds, a contract that unlawfully restrains trade can be reformed judicially to remove this unlawful restraint, then once reformation occurs, the agreement would no longer violate RCW 19.86.030. Relying on Wood v. May, 73 Wn.2d 307, 438 P.2d 587 (1968), the Sheppard court concluded the appropriate remedy was a remand to the trial court to determine whether it could modify the forfeiture provision to provide for a reasonable restraint on Sheppard's right to compete against his former employer. 85 Wn.2d at 933. Khalid obtained this remedy. The trial court explicitly ruled that under RCW 49.44.140, the remedy was reformation of the Assignment Clause to make it consistent with the statute. Khalid does not challenge on appeal the trial court's reformation of the Invention Assignment Clause. This conclusion is supported by federal antitrust case law

which holds that an overbroad non-competition provision in an employment contract, later modified by the court to be enforceable, does not give rise to an antitrust claim. See Baker's Aid, a Div. of M. Raubvogel Co., Inc. v. Hussmann Foodservice Co., 730 F. Supp. 1209, 1211 (E.D.N.Y. 1990) (per se rule does not apply to employee covenants not to compete).

The language of RCW 49.44.140 and corresponding case law indicate that the exclusive remedy for an overbroad invention assignment clause is reformation of the agreement, not a cause of action for unlawful restraint of trade. RCW 49.44.140(1) provides:

> A provision in an employment agreement which provides that an employee shall assign or offer to assign any of the employee's rights in an invention to the employer does not apply to an invention for which no equipment, supplies, facilities, or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless (a) the invention relates (i) directly to the business of the employer, or (ii) to the employer's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by the employee for the employer. Any provision which purports to apply to such an invention is to that extent against the public policy of this state and is to that extent void and unenforceable (Emphasis added).

The trial court found Citrix's Invention Assignment Clause did not comply with this statutory provision, and concluded that the remedy for this violation was "to strike the offending language and amend the language to conform to the requirements of the statute."

The trial court's ruling followed the Supreme Court's decision in Waterjet Tech., Inc. v. Flow Int'l. Corp., 140 Wn.2d 313, 321-22, 996 P.2d 598 (2000). In that case, an employee sought to invalidate an employment agreement based on the employer's violation of RCW 49.44.140(3), the provision requiring the employer

to give notice to the employees of their rights under the statute. Id. at 315. The Supreme Court rejected the employee's argument that the agreement was void in its entirety. Id. at 322. It held that the overreaching portions of the agreement should be stricken as against public policy but the remaining portions of the agreement could still be enforced. Id. Khalid obtained the relief the legislature provided—a reformation of the offending provision in the Employment Agreement.

The trial court did not err in dismissing Khalid's restraint of trade claim under RCW 19.86.030.

2. Dismissal of Khalid's Request for Punitive Damages

Khalid next argues the trial court erred in dismissing his request for punitive damages under Fla. Stat. Ann. § 768.72 for his claims of breach of contract and breach of the implied covenant of good faith and fair dealing. Both parties agree Florida law governs this issue.

A trial court's summary judgment ruling interpreting a statute of another state presents a question of law, reviewed by this court de novo. Osborn v. Mason County, 157 Wn.2d 18, 22, 134 P.3d 197 (2006) (summary judgment legal rulings reviewed de novo); Anthis v. Copland, 173 Wn.2d 752, 755, 270 P.3d 574 (2012) (construction of statute is question of law reviewed de novo); Byrne v. Cooper, 11 Wn. App. 549, 554, 523 P.2d 1216 (1974) (substance of foreign law is issue of law reviewed de novo). See also RCW 5.24.030 (determination of the laws of another state is be determined by court and is subject to appellate review).

Title XLV of the Florida Statutes, entitled "Torts," includes a provision in chapter 768, entitled "Negligence," allowing the recovery of punitive damages for certain claims:

(2)    A defendant may be held liable for punitive damages only if the trier of fact, based on clear and convincing evidence, finds that the defendant was personally guilty of intentional misconduct or gross negligence. As used in this section, the term:

(a)    "Intentional misconduct" means that the defendant had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage.

(b)    "Gross negligence" means that the defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct.

Fla. Stat. Ann. § 768.72(2).  This statutory provision is explicitly limited to claims that arise in tort.  Punitive damages for breach of contract are barred by Florida law.  John Brown Automation, Inc. v. Nobles, 537 So. 2d 614, 617 (Fla. Dist. Ct. App. 1988).  If a party pleads and proves a separate and independent tort, that tort would support a claim for punitive damages.  Id.

The trial court relied on John Brown to support the dismissal of Khalid's punitive damage claim.  In John Brown, the Florida Supreme Court considered whether punitive damages were available to a company claiming a supplier committed negligent misrepresentation during the performance of its supply contract.  Id. at 616-17.  The court vacated the punitive damage award because it determined that the company's misrepresentation claims were "inherent in and extricable from the events constituting the breach of the contract."  Id. at 617-18.

And without "some conduct resulting in personal injury or property damage, there can be no independent tort flowing from a contractual breach which would justify a tort claim solely for economic losses." Id. at 617 (quoting AFM Corp. v. S. Bell Tel. & Tel. Co., 515 So. 2d 180, 181-82 (Fla. 1987)). John Brown supports the trial court's legal ruling.

Ghodrati v. Miami Paneling Corp., 770 So. 2d 181 (Fla. Dist. Ct. App. 2000), also cited by Citrix, similarly supports the dismissal of Khalid's punitive damages request. In that case, a buyer of ceiling tiles sued the seller for breach of contract, fraudulent inducement, deceit and negligent misrepresentation, seeking compensatory and punitive damages. Id. at 182. The appellate court affirmed the dismissal of the buyer's punitive damages claim because she was not entitled to recover damages in tort that duplicated the damages the court awarded for breach of contract. Id. at 183. Because the buyer suffered no damages other than the breach-of-contract damages, she could not rely on the alleged tort claims to recover punitive damages. Id.

We agree with the trial court that John Brown and Ghodrati preclude Khalid's request for punitive damages based on Citrix's breach of contract.[10] Although the trial court concluded the Invention Assignment Clause violated RCW 49.44.140, it denied Khalid's request to deem the agreement unconscionable. It remedied the defect in the Invention Assignment Clause by striking the offending language and conforming it to the statute. Id. And there was no evidence that

---

[10] Khalid alleged only two independent tort claims: wrongful termination, which he voluntarily dismissed before trial, and a claim of tortious interference with business expectancy, which the trial court ruled arose under Washington and not Florida law.

Citrix's endeavors to enforce an invalid provision of the Invention Assignment Clause caused Khalid any personal injury or property damage under Florida's economic loss rule. Although Khalid initially sought damages for "emotional distress, loss of enjoyment of life, humiliation, personal indignity, embarrassment, fear, anxiety, and/or anguish," he voluntarily dismissed that claim in January 2018, and the parties agreed no evidence of any personal injury damages would be presented at trial. The only damages Khalid sought at trial were economic losses and he recovered $3 million in compensatory damages for the breach of contract. Thus, any loss he may have sustained has been fully compensated.

Khalid's reliance on Adams v. Whitfield, 290 So. 2d 49 (Fla. 1974) and Griffith v. Shamrock Vill., Inc., 94 So. 2d 854 (Fla. 1957) is misplaced. In Adams, a petitioner prevailed on a claim of malicious prosecution. 290 So. 2d at 50-51. The sole issue on appeal was whether there was sufficient evidence of actual malice to support a punitive damage award. Id. The Florida Supreme Court held that an award of punitive damages only required proof of "legal malice," not actual malice. Id. at 51. Legal malice, it concluded, can be inferred from gross negligence indicating a wanton disregard for the rights of others. Id. The court noted that "this is true whether the cause of action is for malicious prosecution, for some other tort, or for a breach of contract." Id. But the statement relating to contract claims is clearly dicta as the case did not involve any allegation of a breach of contract.

In Griffith, a tenant sued his landlord for gross negligence in failing to deliver a telephone message from his brother that the location of the brother's wedding had changed, resulting in the tenant—the best man—missing the wedding. Id. at

855. On appeal, the tenant contended the trial court should have allowed him to pursue punitive damages against the landlord. Id. at 857. In concluding that the evidence supported a punitive damage request, the court noted that the evidence showed the landlord undertook to accept telephone calls and messages for its tenants, thereby assuming a duty to the tenant. Id. at 857-88. But "[t]he complaint on which this case was tried sounds in tort, not in contract." Id. at 858. And it further noted that while punitive damages are not recoverable for breach of contract,

> [w]here the acts constituting a breach of contract also amount to a cause of action in tort there may be a recovery of exemplary damages upon proper allegations and proof. In order to permit a recovery, however, the breach must be attended by some intentional wrong, insult, abuse or gross negligence which amounts to an independent tort.

Id. at 858. Because the evidence of the landlord's gross negligence was sufficient to demonstrate "an entire want of care," the court held that the jury should have been allowed to determine whether a punitive damages award was warranted. Id. at 858.

John Brown is consistent with Griffith. Even if the parties are in a contractual relationship, if a party pleads and proves the other party engaged in tortious conduct, punitive damages may be awarded for that tortious conduct. Unlike the plaintiff in Griffith, Khalid had no underlying tort-based claims arising under Florida law and he did not prove that any tortious conduct occurred.[11] Because Khalid did

---

[11] As Citrix correctly points out, the other cases on which Khalid relies all involved independent tort claims. See Aero Int'l Corp. v. Florida Nat'l Bank, 437 So. 2d 156 (Fla. Dist. Ct. App. 1983) (airplane repair company sued bank for breach of fiduciary duty for failing to pay client interest owed to client under escrow agreement); Hogan v. Provident Life & Acc. Ins. Co., 665 F. Supp. 2d 1273, 1279, 1289 (M.D. Fla. 2009) (insured pleaded sufficient facts on claims for breach

not prove Citrix engaged in any tortious conduct under Florida law, prevailed only on contract-based claims, and sustained neither personal injuries nor property damage, Khalid was not entitled to recover punitive damages. The trial court did not err in dismissing this claim.

3. Khalid's Challenge to Jury Instruction No. 31

Khalid contends that Jury Instruction 31 incorrectly stated Florida law on his claim of breach of the implied covenant of good faith and fair dealing. Jury Instruction 31 read:

> To establish that Citrix breached the implied covenant of good faith and fair dealing, Khalid must show that Citrix failed to comply with contractual responsibilities through a conscious and deliberate act, and not by an honest mistake, bad judgment, or negligence.

Khalid argues that an instruction requiring him to prove that Citrix acted "consciously and deliberately and not through an honest mistake, bad judgment or negligence," imposed a higher standard than is warranted under Florida law. We disagree.

Appellate courts review jury instructions to determine whether they properly informed the jury of the applicable law, whether they were misleading, and whether they allowed each party to argue their theory of the case. Spivey v. City of Bellevue, 187 Wn.2d 716, 738, 389 P.3d 504 (2017). We review a trial court's

---

of fiduciary duty, aiding and abetting breach of fiduciary duty, fraud, and negligence, to withstand insurers' Fed. R. Civ. P. 12(b)(6) motion to dismiss claim for punitive damages under Fla. Stat. Ann. §768.72); Massey-Ferguson, Inc. v. Santa Rosa Tractor Co., 415 So. 2d 865, 866-67 (Fla. Dist. Ct. App. 1982) (dealer action against manufacturer for trespass and tortious interference with business; evidence supported punitive damage award for unlawful and unreasonable seizure of collateral); Gregg v. U.S. Indus., Inc., 887 F.2d 1462, 1476 (11th Cir. 1989): seller of corporation sued buyer for fraud and tortious interference with business relationships; punitive damages award affirmed because evidence supported jury finding of tortious interference).

decision to give a jury instruction de novo when based on a matter of law. Hendrickson v. Moses Lake School Dist., 192 Wn.2d 269, 274, 428 P.3d 1197 (2018).

Khalid first argues the trial court erred in giving an instruction not included in Florida's standard jury instructions. Florida, like Washington, publishes a set of pattern jury instructions. In re Standard Jury Instructions in Contract & Bus. Cases, 2018 Report, 260 So. 3d 87 (Fla. 2018). The trial court provided the jury with a modified version of Standard Instruction 416.24, entitled "Breach of Implied Covenant of Good Faith and Fair Dealing," for each of Khalid's implied covenant claims.[12]

Although the trial court added Jury Instruction 31 at Citrix's request, there is no basis for contending that supplementing Florida's standard instructions is erroneous. The Florida Supreme Court has indicated that trial courts may add instructions not included in its standard set. When it adopted the latest version of the standard contract instructions, it reminded "all interested parties that this

---

[12] Florida's Standard Instruction 416.24 provides:

> An implied covenant of good faith and fair dealing exists in all contracts. (Claimant) contends that (defendant) violated the implied covenant of good faith and fair dealing in the contract in this case. To establish this claim, (claimant) must prove all of the following:
> 1.     (Claimant) and (defendant) entered into a contract;
> 2.     (Claimant) did all, or substantially all, of the significant things that the contract required [him] [her] [it] to do [or that [he] [she] [it] was excused from having to do those things];
> 3.     All conditions required for (defendant's) performance had occurred;
> 4.     (Defendant's) conduct was not consistent with (parties') reasonable expectations under [identify specific provision(s) of the contract]; and
> 5.     (Claimant) was damaged by (defendant's) conduct.

Florida Standard Jury Instructions, Contract & Business Instructions, https://jury.flcourts.org/contract-business-cases-4/contract-business-cases-instructions (last visited Nov. 5, 2020).

authorization forecloses neither requesting additional or alternative instructions ....” In re Standard Jury Instructions in Contract & Bus. Cases-2018 Report, 260 So. 3d at 88.

As long as Jury Instruction 31 clearly and accurately stated the applicable law, the trial court did not err in including an instruction that is not included in Florida's standard contract instructions.

Khalid next contends Jury Instruction 31 is not an accurate statement of Florida law. Florida courts recognize an implied covenant of good faith and fair dealing in every contract. County of Brevard v. Miorelli Eng'g, Inc., 703 So. 2d 1049, 1050 (Fla. 1997); Snow v. Ruden, McClosky, Smith, Schuster & Russell, P.A., 896 So. 2d 787, 791 (Fla. Dist. Ct. App. 2005). The rights conferred by the implied covenant of good faith and fair dealing, however, are limited. QBE Ins. Corp. v. Chalfonte Condo. Apt. Ass'n, Inc., 94 So. 3d 541, 548 (Fla. 2012). An action for such a breach cannot be maintained in the absence of a breach of an express contract provision. Hosp.l Corp. of Am. v. Florida Med. Ctr., Inc., 710 So. 2d 573, 575 (Fla. Dist. Ct. App. 1998); Snow, 896 So. 2d at 792. The “duty of good faith performance does not exist until a plaintiff can establish a term of the contract the other party was obligated to perform and did not.” 896 So. 2d at 792 (quoting Avatar Dev. Corp. v. De Pani Constr., Inc., 834 So. 2d 873, 976 (Fla. Dist. Ct. App. 2002)).

Under Florida law, the implied covenant has been described as serving merely as a “gap-filling default rule.” Publix Super Markets, Inc. v. Wilder Corp. of Delaware, 876 So. 2d 652, 654 (Fla. Dist. Ct. App. 2004). The claim is usually

raised when a question is not resolved by the terms of the contract or when one party has the power to make a discretionary decision without defined standards. Publix, 876 So. 2d at 654. A claim for breach of the implied covenant of good faith may be dismissed as redundant if based on the same allegations as those underlying the breach of contract claim. Alvarez v. Royal Carribean Cruises, Ltd., 905 F. Supp. 2d 1334, 1341 (S.D. Fla. 2012).

The trial court based Jury Instruction 31 on Tiara Condo. Ass'n, Inc. v. Mash & McLennan Cos., Inc., 607 F.3d 742 (11th Cir. 2010). In that case, a condominium homeowners association sued their insurance broker for failing to procure adequate insurance after the condominium tower suffered extensive wind damage in two hurricanes in 2004. Id. at 745. The Eleventh Circuit Court of Appeals held:

> Under Florida law, a party breaches [the implied covenant of good faith and fair dealing] by "a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment, or negligence; but, rather by a conscious and deliberate act, which unfairly frustrates the agreed common purpose and disappoints the reasonable expectations of the other party."

Id. at 747 (quoting Shibata v. Lim, 133 F. Supp. 2d 1311, 1319 (M.D. Fla. 2000)). Instruction 31 is an accurate statement of Florida law as set out in Tiara and the case on which it relied, Shibata.

Khalid contends Tiara and Shibata are based on a misunderstanding of Florida law. He argues that under Cox v. CSX Intermodal, Inc., 732 So. 2d 1092 (Fla. Dist. Ct. App. 1999), conduct may violate an implied covenant of good faith and fair dealing if it is found to be merely "arbitrary" or "unreasonable." While the

"arbitrary" or "unreasonable" test may apply to certain types of implied covenant claims, the trial court correctly determined that it is inapplicable here.

In Cox, the court was interpreting written contracts that were silent on the methodology or standard a rail transport company was to use in exercising its contractual discretion to assign loads for transport. 732 So. 2d at 1098. The Cox court held that when a contract grants discretion to one party "to promote that party's self-interest, the duty to act in good faith . . . limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party." Id. at 1097-98. This "discretion" concept, however, applies only where there is an express contractual duty or obligation over which one party has sole discretion. Meruelo v. Mark Andrew of Palm Beaches, Ltd., 12 So. 3d 247, 251 (Fla. Dist. Ct. App. 2009). See also Speedway SuperAmerica, LLC v. Tropic Enterprises, Inc., 966 So. 2d 1, 3-5 (Fla. Dist. Ct. App. 2007) (when contract contains no provision detailing when landlord may withhold consent to an assignment, court will imply a covenant of good faith to limit landlord's ability to act capriciously); Overseas Inv. Grp. v. Wall Street Electronica, Inc., 181 So. 3d 1288, 1291 (Fla. Dist. Ct. App. 2016) (customer agreement lacked defined standards for exercise of discretion in liquidating brokerage account; implied covenant filled that gap).

Khalid's implied covenant claim was not based on the contention that Citrix had the sole contractual discretion to take some action and exercised that discretion arbitrarily or unreasonably. In his closing argument to the jury, Khalid maintained that Citrix violated an implied covenant of good faith and fair dealing in

- 36 -

the Employment and Severance Agreements by refusing, after his termination, to acknowledge that Khalid had explicitly excluded his security software and mini-cloud inventions from the scope of the Inventions Assignment Clause. Because Khalid's claim was not premised on an express contractual provision granting Citrix the sole discretion to take some action, the "arbitrary" or "unreasonable" standard from Cox does not apply.

The Shibata court recognized a second circumstance in which Florida courts have implied a covenant of good faith and fair dealing – when a contract is ambiguous about the permissibility of one party's conduct. 133 F. Supp. 2d at 1318. Shibata and Tiara are not the only cases setting out this legal standard. A plethora of federal courts, applying Florida law, have held that a plaintiff must prove that the defendant's conduct was "prompted not by an honest mistake, bad judgment or negligence, but, rather by a conscious and deliberate act, which unfairly frustrates the agreed common purpose and disappoints the reasonable expectations of the other party." Resnick v. AvMed, Inc., 693 F.3d 1317, 1329 (11th Cir. 2012); Doe v. Lynn University, 235 F. Supp. 3d 1336, 1343 (S.D. Fla. 2017); JDI Holdings, LLC v. Jet Management, Inc., 732 F. Supp. 2d 1205, 1226 (N.D. Fla. 2010); Bookworld Trade, Inc. v. Daughters of St. Paul, Inc., 532 F. Supp. 2d 1350, 1359 (M.D. Fla. 2007). See also 11 Fla. Jur. 2d Contracts § 272 (2020) (recognizing "conscious and deliberate act" standard from Resnick and Bookworld).

It follows logically from these cases that if a plaintiff and defendant disagree over a defendant's obligations under the terms of an ambiguous contract, the

defendant may be exposed to liability for a breach of a covenant of good faith and fair dealing only if the plaintiff can prove the defendant was not merely mistaken in its interpretation of the contract (which would nevertheless constitute a breach of the agreement) but also deliberately refused to perform with the intent to deny the plaintiff the benefits he would otherwise be due.

Khalid argues that these federal cases are not authoritative determinations of state law. But federal courts applying Florida law are required to apply the law as declared by that state's Supreme Court, CSX Transp., Inc. v. Trism Specialized Carriers, Inc., 182 F.3d 788, 790 (11th Cir. 1999), or in the absence of authority on point, must follow relevant decisions of Florida's intermediate appellate courts and attempt to determine state law as they believe the Florida Supreme Court would. State Farm Fire & Cas. Co. v. Steinberg, 393 F.3d 1226, 1231 (11th Cir. 2004). And Florida appellate courts have routinely cited federal cases when discussing state law on the implied covenant of good faith and fair dealing. See Ins. Concepts & Designs, Inc. v. Health Plan Services, Inc., 785 So. 2d 1232, 1234 (Fla. Dist. Ct. App. 2001); Snow, 896 So. 2d at 792.

Khalid cites no Florida appellate case rejecting the holding of Shibata, Tiara and their progeny. We assume that where no such authority is cited, counsel has searched and found none. State v. Young, 89 Wn.2d 613, 625, 574 P.2d 1171 (1978). The trial court did not err in relying on federal courts' determinations of Florida state law.

4. Citrix's Challenge to Jury Instruction No. 35

Citrix argues the trial court erred in instructing the jury that Khalid could recover lost profits on his breach of contract claim. The trial court gave a jury instruction on lost profits based on Florida Standard Jury Instruction 504.3. Instruction 35 read in relevant part:

> Mr. Khalid alleges he suffered lost profits as a consequence of Citrix's breaches of the Employment Agreement and the covenants of good faith and fair dealing. Lost profits are a type of compensatory damages. To be entitled to recover lost profits, Mr. Khalid must prove both of the following:
>
> (1) Citrix's breaches caused Mr. Khalid to lose profits; and
> (2) Mr. Khalid can establish the amount of his lost profits with reasonable certainty.
>
> For Khalid to establish the amount of his lost profits with reasonable certainty, he must prove that a reasonable person would be satisfied that the amount of lost profits which he may be entitled to recover is not simply the result of speculation or guessing. Instead, he must prove that there is some standard by which the amount of lost profits may be established. Mr. Khalid does not have to be able to prove that the amount of lost profits can be calculated with mathematical precision as long as he has shown there is a reasonable basis for determining the amount of the loss.
>
> Even though Mr. Khalid's business is not established or does not have a "track record," he still may be able to establish the amount of lost profits which they may be entitled to recover if they prove that there is some standard by which the amount of lost profits may be established.

In its opening brief, Citrix did not contend that Jury Instruction 35 is an incorrect statement of Florida law. Instead, it maintained that only Xencare, and not Khalid, could have experienced lost profits because "[t]here is no evidence in this record that . . . Khalid could lose profits from a company he hadn't even formed at the time the [Employment Agreement] was entered into."

As Khalid correctly pointed out in his responsive brief, this argument is a challenge to the sufficiency of the evidence, not to the language of the instruction itself. And a defendant waives a challenge to the sufficiency of a plaintiff's evidence by presenting evidence in defense of a claim. Hector v. Martin, 51 Wn.2d 707, 709, 321 P.2d 555 (1958); NW Wholesale v. Pac Organic Fruit, LLC, 184 Wn.2d 176, 182-83, 357 P.3d 650 (2015). Citrix did not challenge the sufficiency of the evidence as to Khalid's claim of lost profits before it began presenting evidence in its case in chief and thus waived the issue.

In reply, Citrix argued for the first time that the jury instruction was legally erroneous, because under Florida law, a plaintiff is required to prove that the loss was in the "reasonable contemplation" of the parties at the time of the contract. See Frenz Enterprises v. Port Everglades, 746 So. 2d 498, 504 (Fla. Dist. Ct. App.1999); see also Hardwick Props., Inc. v. Newbern, 711 So. 2d 35, 40 (Fla. Dist. Ct. App.1998) (consequential damages "stem from losses incurred by the non-breaching party in its dealings, often with third parties, which were a proximate result of the breach, and which were reasonably foreseeable by the breaching party at the time of contracting."). It contends Khalid presented no evidence that Citrix knew or should have known that Khalid could lose profits from a company he had not formed at the time of the contract. But because this argument was raised for the first time in a reply brief, it too has been waived. See Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) ("An issue raised and argued for the first time in a reply brief is too late to warrant consideration.").

Moreover, Citrix did not adequately preserve its objection to Jury Instruction 35 at trial. CR 51(f) requires a party objecting to a jury instruction to "state distinctly the matter to which he objects and the grounds of his objection." Washburn v. City of Fed. Way, 178 Wn.2d 732, 746, 310 P.3d 1275 (2013). "The pertinent inquiry on review is whether the exception was sufficient to apprise the trial judge of the nature and substance of the objection." Walker v. State, 121 Wn.2d 214, 217, 848 P.2d 721 (1993) (quoting Crossen v. Skagit County, 100 Wn.2d 355, 358, 669 P.2d 1244 (1983)). This court will consider a claimed error only if the appellant raised the specific issue at trial. Galvan v. Prosser Packers, Inc., 83 Wn.2d 690, 692, 521 P.2d 929 (1974) (noting that consideration of errors in instructions on appeal "is limited to those issues specifically raised" at trial).

Here, Citrix did not adequately preserve the error as required by CR 51(f). When the parties discussed jury instructions, Citrix's argument as to Instruction 35 was limited to one sentence: "We except to 35, lost profits. Considered a type of damage for breach of contract." This exception is insufficient to inform the trial court or counsel that Citrix considered the instruction legally deficient because it lacked a foreseeability element. A review of the record shows that at no point other than this did Citrix object to Instruction 35.[13]

Citrix also challenges the instruction on the grounds that it instructed the jury to determine Khalid's, and not Xencare's, lost profits. Citrix argues that because Khalid assigned both patents to Xencare, only Xencare could recover lost profits.

---

[13] In its reply brief, Citrix argues merely that "[i]t is undisputed that the parties discussed and argued jury instructions at length."

Again, this argument is a challenge to the sufficiency of the evidence, an issue Citrix waived below. And Citrix did not alert the trial court that an instruction allowing the jury to award lost profits to Khalid, rather than only to Xencare, was legally erroneous. Indeed, Citrix itself proposed an instruction which would have permitted the jury to award lost profits to Khalid. Citrix's failure to raise this specific objection below constitutes a waiver of any error.[14] We therefore reject Citrix's challenge to Jury Instruction 35.

### 5. Citrix's Post-Trial Motion for Judgment as Matter of Law

Citrix argues the trial court erred in denying its CR 50 motion for judgment as a matter of law on three specific grounds: (1) Khalid's failure to perform all the essential terms of his Employment Agreement precluded his claim against Citrix for breach; (2) Khalid could not establish causation between Citrix's breach and Khalid's damages because Microsoft had a preexisting claim to the same intellectual property; and (3) the Severance Agreement, if enforceable against Citrix, barred Khalid from prosecuting a breach of Employment Agreement claim. We conclude Citrix failed to preserve the first and third arguments. And the trial court did not err in rejecting its second argument because the evidence, taken in the light most favorable to Khalid, supports the jury's verdict in his favor.

CR 50 permits a court to enter judgment as a matter of law if "during a trial by jury, a party has been fully heard with respect to an issue and there is no legally

---

[14] Citrix cites no authority to support its argument that the sole owner of a corporate entity cannot recover lost profits arising from the breach of a contract he signed in his individual capacity. In reply, Citrix cites Grayson v. Nordic Const. Co, Inc., 92 Wn.2d 548, 552, 599 P.2d 1271 (1979), for the unremarkable proposition that "[a] corporation exists as an organization distinct from the personality of its shareholders." But, as Khalid notes, his expert at trial presented damages reflecting amounts that could be allocated to Khalid through his ownership interest in his company.

sufficient evidentiary basis for a reasonable jury to find or have found for that party with respect to that issue."  CR 50(a)(1).

We conclude Citrix failed to preserve two of the three arguments it raises here.  Citrix did not seek judgment as a matter of law on the ground that Khalid failed to perform his obligations under the Employment Agreement or on the ground that the Severance Agreement contained a release of claims before the case was submitted to the jury.  "A motion for judgment as a matter of law may be made at any time before submission of the case to the jury."  CR 50(a)(2) (emphasis added).  CR 50(a) "makes clear that a party must move for judgment as a matter of law before the trial court submits the case to the jury to preserve any opportunity to renew its motion after the case is submitted."  Hanks v. Grace, 167 Wn. App. 542, 552-53, 273 P.3d 1029 (2012).  See also Millies v. LandAmerica Transnation, 185 Wn.2d 302, 315, 372 P.3d 111 (2016) (a party is required to move for judgment as a matter of law before the case is submitted to the jury to preserve any opportunity to renew the motion after the verdict).  CR 50(b) allows a party to renew a request for judgment as a matter of law by filing a motion within 10 days of judgment but it does not allow a party to raise such arguments for the first time at that stage of the proceedings.

Here, following the close of Khalid's case in chief, Citrix orally moved for judgment as a matter of law on only four grounds: (1) the Severance Agreement payment was not "wages" under Washington's wage law; (2) Microsoft's ownership claim to Khalid's inventions prevented Khalid from establishing causation between Citrix's actions and his claimed damages; (3) Citrix did not breach the Severance

- 43 -

Agreement because Khalid had revoked it; and (4) Khalid failed to prove a CPA violation. The trial court reserved ruling on the wage claim and denied the remainder of Citrix's motion.

After the jury rendered its verdict, Citrix renewed its motion, reiterating the four arguments it made before it began its case in chief, and raising three new arguments: (1) any lost profits awarded to Khalid must be disgorged and paid to Citrix for his trademark infringement; (2) the Severance Agreement release barred Khalid's claim for breach of the Employment Agreement; and (3) lost profit damages are not proper damages for breach of the Employment Agreement. The trial court denied Citrix's motion.

Citrix never sought judgment as a matter of law based on the argument that Khalid had failed to perform all the essential terms of his Employment Agreement. Nor did it argue, before the case went to the jury, that the Severance Agreement barred Khalid from prosecuting his contract claim. While it raised the Severance Agreement release post-verdict, this was insufficient to preserve the error under CR 50. Citrix did not preserve these claims for appeal.

Citing Morningstar v. Worthy, 454 F. App'x. 391, 398-99 (6th Cir. 2011), Citrix argues that an "almost fleeting" reference to the issues should suffice to preserve them for appeal. But the trial court in Morningstar entered a finding of fact that the defendant had raised testimonial immunity as a basis for judgment as a matter of law before the claim for malicious prosecution was submitted to the jury. Id. at 398. The reference was, as the trial court described it, "almost fleeting," but it was sufficient to preserve the defense for the officer's post-verdict CR 50(b)

motion. Id. The Sixth Circuit held that the trial court's finding that the defense was raised prior to the verdict was not an abuse of discretion, and "preservation for appellate purposes is not at issue here." Id.

Unlike Morningstar, we have no finding by the trial court that Citrix's counsel made any pre-verdict reference, let alone a "fleeting" one, to the argument that Khalid could not, as a matter of law, prove Citrix breached the Employment Agreement because Khalid breached it first. Nor did the trial court find that Citrix argued, pre-verdict, that the release in the Severance Agreement barred Khalid's claim for breach of the Employment Agreement. Although Citrix sought the dismissal of both contract-based claims, it did so on completely different grounds.

As to Citrix's second claim regarding the causal link between Citrix's claim of ownership to Khalid's patents and Khalid's lost profits, the trial court did not err in rejecting this argument. A motion for judgment as a matter of law admits the truth of the evidence of the nonmoving party and all inferences that reasonably can be drawn from that evidence. Ramey v. Knorr, 130 Wn. App. 672, 675-76, 124 P.3d 314 (2005). The trial court may grant such a motion only if there is no legally sufficient evidentiary basis for a reasonable fact finder to find for the nonmoving party with respect to that issue. CR 50(a)(1). We review orders denying judgment as a matter of law de novo. Leren v. Kaiser Gypsum Co., 9 Wn. App. 2d 55, 70, 442 P.3d 273 (2019), as amended on denial of reconsideration (Aug. 8, 2019), review denied sub nom. Leren v. Elementis Chemicals, Inc., 194 Wn.2d 1017, 455 P.3d 133 (2020).

Citrix argues that because Microsoft also claimed an ownership interest in the '219 and '637 Patents, Khalid could not prove his losses were caused by Citrix's assertion of ownership to the same inventions. But Citrix's argument ignores the applicable standard for reviewing the evidence at trial. When viewed in the light most favorable to Khalid, there was more than sufficient evidence of causation to submit Khalid's contract claims to the jury.

Citrix presented evidence that when Khalid joined Microsoft in 1998, he signed an employment agreement containing an invention assignment clause. Khalid admitted he did not carve out, from the scope of this clause, any preexisting inventions. After Khalid left Microsoft in 2006 to join Citrix, Khalid received an email from an intellectual property attorney at Microsoft, asserting that Microsoft owned Khalid's patents and inventions. The email stated as follows:

> I'm disappointed to now hear that you not only filed one, but several, independent patent applications during your employment with Microsoft. With respect to each of those inventions, unless you can prove each of the exclusion criteria set forth in paragraph 4 of your Employment Agreement, you have a legal obligation to assign your ownership to Microsoft.

The email demanded that Khalid prove that his inventions qualified as excluded subject matter, and informed him that if he refused to cooperate, "Microsoft is the rightful owner of the inventions and applications."

But we must accept as true Khalid's testimony that he began developing the mini-cloud system before he began working for Microsoft. No one from Microsoft ever followed up with him about this invention, and Khalid did not believe at the time that Microsoft actually planned to assert ownership of the invention. And

Khalid had subsequent conversations with Microsoft that led him to believe Microsoft did not have any interest in the market sector of his developments.

Khalid's damage claim against Citrix was based on lost profits between November 2011 and December 2016. We again must accept as true Khalid's testimony that Microsoft's 2006 email did not lead him to lose investors because by the time he left Citrix in 2011, Microsoft had taken no action on any claim of ownership and he felt no need to disclose the email to any prospective investors.

Although Citrix also presented evidence that when Khalid was rehired by Microsoft in December 2011, he signed another invention assignment agreement with that company, and that when Khalid was terminated by Microsoft in 2015, Microsoft again claimed to own Khalid's intellectual property. Khalid testified he had done the vast majority of the development work on the mini-cloud invention in 2008, after leaving Microsoft. He disclosed to Citrix in the Employment Agreement that he had offered his intellectual property to Microsoft but he later learned his prior employer had no interest in it. And the Softlock antivirus software was not a part of any work he had done at Microsoft. Finally, when Khalid was rehired by Microsoft in 2011, he explicitly disclosed to Microsoft a complete list of his personal inventions, including both the antivirus software and the mini-cloud invention. This evidence, if accepted as true, is sufficient to undermine Citrix's causation argument.

Citrix next contends that Mina, who offered to purchase 50,000 copies of the Softlock antivirus software in 2011, provided Khalid a letter in 2015 in which he stated that Microsoft's alleged interest in Khalid's inventions interfered with his decision to

invest.  Mina indeed acknowledged that in 2015, he undertook business discussions with Khalid but "decided not to proceed with our investment commitment" after learning about Microsoft's claim of ownership to one of Khalid's patents.  But Khalid contends Mina's testimony related to a completely different business venture "built around an IP portfolio, not to Xencare in 2011 which would have been built around a product."  The record supports Khalid's characterization of Mina's testimony:

> Q:  ....  Going down to the bottom paragraph, Mr. Khalid tells you why he needs the letter, correct, Mr. Mina?  He needs it because he's meeting with an IP . . . He's meeting with an IP lawyer due to Microsoft IP issue.  And he says, "I have your email that we discussed around $350,000 investment in IP that didn't materialize because of Microsoft," right?  That's what he was asking you to write about.  You would have also invested $350,000, but Microsoft interfered with your decision, correct?
>
> A.  It was meant for a different venture called IP portfolio, rather than product; you go with IP portfolio.
>
> Q.  Understood.  A different business venture.  But whatever it was, according to Mr. Khalid and the letter you wrote, you didn't follow through on that because of Microsoft, not because of Citrix, right?
>
> A.  We were interested in IP portfolio.  . . . I don't know if Citrix side was involved or not.

Khalid also presented evidence that Microsoft subsequently offered to relinquish any ownership interest in his '637 Patent in exchange for a licensing arrangement.  In closing, Khalid argued if Microsoft had asserted any ownership interest in 2011, he could have negotiated a similar arrangement with Microsoft at the time.[15]

The jury was instructed, pursuant to Florida Standard Instructions for Contracts and Business Instruction 504.2(a), that in order for Khalid to recover

---

[15] The record also suggests the jury's damage award related to anticipated Softlock software license sales to Mina at Pragma and Microsoft had not asserted a claim to that antivirus software.

damages for any breach, the damages must have been those that "naturally result from such breaches." See Lucas Truck Serv. Co. v. Hargrove, 443 So. 2d 260, 263 (Fla. Dist. Ct. App. 1983) ("In order that a party may recover profits lost by reason of a breach of contract, the loss must be the natural and proximate result of the breach, whether as an ordinary consequence thereof, or as a consequence which may, under the circumstances, be presumed to have been in the contemplation of the parties at the time they made the contract.").

Citrix argued to the jury that Microsoft's assertion of ownership broke the causal change between Citrix's actions and Khalid's damages:

> And if Microsoft's assertion of an ownership interest here is material to an investor, if his argument is that Citrix's assertion of ownership is material to an investor, Citrix could not have caused any damage here.
>
> He's already in trouble because he knows that Microsoft is asserting ownership. He can't pick and choose which companies assertion of interest is material to an investor. They both are. And if he is claiming we caused harm, and we prevented him from getting startup money because we asserted an ownership interest, that's not right. There is something else that happened first, and that's this at Microsoft. And you know from Exhibit B that he full well knows it. No matter how many times on the stand he said it, Microsoft had no interest. Exhibit B says it all. It's right there.

The jury obviously rejected this causation argument.

Viewing the evidence in the light most favorable to Khalid, a jury could have found that Khalid's investors did not know about Microsoft's 2006 assertion of ownership, and therefore it could not have interrupted the chain of causation when Citrix made its unlawful demands to Khalid's patents in 2011. And it could have also found that any investment Mina chose not to make in 2015 was related to a different business venture he was discussing with Khalid and not related to his decision not to

purchase Softlock software licenses between 2011 and 2015. For this reason, the trial court did not err in denying Citrix's motion for judgment as a matter of law.

6. Khalid's Request for Declaratory Judgment of Citrix's Ownership Rights

Citrix next challenges the trial court's determination that Citrix holds no ownership interest in the '219 or '637 Patents. Because the trial court's declaratory judgment is based on the jury's verdict, and that verdict is supported by the evidence, we find no error in the entry of the declaratory judgment in favor of Khalid.

In a post-trial motion, Khalid sought declaratory relief that Citrix had no ownership interest in the '219 or '637 Patents. Prior to trial, Citrix in turn sought declaratory relief that it owned the patents and that Khalid did not. The trial court concluded that "[t]he jury's rejection of [Citrix's] breach of contract claim and its decision in favor of Plaintiff Khalid on his breach of contract claim requires the conclusion that Defendant Citrix did not gain ownership of Plaintiffs' intellectual property through the Agreement. Defendant had no other basis for claiming ownership of the intellectual property." It granted Khalid his requested declaratory relief, "declar[ing] that Citrix has no ownership or other rights to or arising under US Patent No. 8,286,219 and 8,782,637."

In reviewing a declaratory judgment, we review whether the trial court's findings of fact are supported by substantial evidence and, if so, whether the findings support the trial court's conclusions of law. Sunnyside Valley Irrig. Dist. v. Dickie, 149 Wn.2d 873, 879–80, 73 P.3d 369 (2003). Unchallenged findings of fact are verities on appeal. Buck Mountain Owners' Ass'n v. Prestwich, 174 Wn. App. 702, 714, 308 P.3d 644 (2013).

Citrix first contends the trial court erred in refusing to hold a subsequent evidentiary hearing on the ownership issue. Citrix argues it "was entitled to a full equitable proceeding in which evidence and briefing specific to ownership could be presented." But it provides no authority for this proposition. Nor is there any merit to Citrix's argument that the trial court erred in relying on the jury verdict, "effectively converting a bench issue into a jury issue." Generally, a trial court may not substitute its judgment for the jury's and in a case in which legal claims are tried to a jury and equitable claims are tried by a judge, the judge will follow the jury's factual determinations unless several different theories support the jury verdict. Spencer v. Badgley Mullins Turner, PLLC, 6 Wn. App. 2d 762, 797, 432 P.3d 821 (2018), citing Teutscher v. Woodson, 835 F.3d 936, 944 (9th Cir. 2016) and L.A. Police Protective League v. Gates, 995 F.2d 1469, 1473 (9th Cir. 1993).

In this case, Khalid maintained throughout trial that he owned the patents and the intellectual property contained in the patents because he conceived of the inventions before he began working for Citrix and he developed them on his own time, using his own resources. He testified none of the work he did to develop the '219 or '637 Patent was related in any way to any assignments he had while at Citrix or related to any products it had under development. He presented evidence that when he showed his inventions to Citrix, he indicated the ideas were his own independent work, and that he was approaching Citrix merely to entice the company to invest in his startup company. But the company rebuffed him and indicated it had no interest whatsoever in what he had developed. Khalid's testimony in this regard

was corroborated by the testimony of his former supervisor, Sirjani, as well as Citrix

managerial employees, Duursma, Pedersen, and DeForeest.

Khalid's breach of contract claim was based on one single theory: "[t]he jury

will be asked to decide whether Citrix breached its Employment Agreement with Mr.

Khalid by claiming ownership to and demanding assignment of the inventions

protected by the Employment Agreement . . . ." Jury Instruction 15 required Khalid

to prove that "Citrix failed to do something essential which the contract required it to

do or did something which the contract prohibited it from doing and that prohibition

was essential to the contract." In closing, Khalid made his theory – and the only theory

– clear:

> Citrix failed to do something essential, which the contract required it to
> do or did something which the contract prohibited it from doing, and
> that [the] prohibition was essential to the contract. And so, ladies and
> gentlemen, what that means in the context of [the Employment
> Agreement] is did Citrix do something that it was prohibited from doing.
> That's the question you have to answer to consider element four. And
> what Citrix was prohibited from doing, according to Ms. Ponikiewicz,
> was making a claim to intellectual property that had been disclosed on
> Exhibit B. By doing that, by telling Khalid at the time that he was
> terminated that it owned his intellectual property, and then threatening
> to sue him, Citrix breached this contract. It failed to do something it
> was prohibited from doing.

The jury found that Citrix breached the Employment Agreement. Given the

sole theory under which Khalid proceeded at trial, the trial court properly concluded

the jury's verdict was based on its finding that Citrix had claimed ownership to

intellectual property it did not own. Under Spencer, the trial court did not abuse its

discretion in concluding that the jury verdict resolved the question of Citrix's claimed

ownership interest in Khalid's inventions.

Citrix next argues that the trial court failed to recognize that it "had an ownership claim to the patents under common law theories that arise from the fact that Khalid, was 'hired to invent' and intellectual property was an integral part of his work assignment." But the trial court found that Citrix "claimed ownership interest of the patents at issue in this litigation on the basis of [the Employment] Agreement and asserted no other grounds for claiming ownership." Citrix has not assigned error to this factual finding.

Moreover, Citrix fails to provide this court with any support for the proposition that an employer may assert, by common law, an ownership interest in its employee's intellectual property when the parties' rights are clearly governed by a written invention agreement. Citrix claims it has "shop rights" to Kahlid's inventions, citing to Wellington Print Works, Inc. v. Magid, 242 F. Supp. 614, 617 (E.D. Pa. 1965). That case involved a textile engineer who used the company's time, resources and personnel to develop new techniques. Unlike this case, there was no agreement, either express or implied, between the employer and employee under which the employee was required to assign any inventions to his employer. Id. at 617. Because the engineer had used company resources to develop the inventions, the federal court concluded the employer gained a "shop right" to the inventions, giving it a non-exclusive license to practice the inventions. Id. at 617.

Citrix's reliance on Wellington is misplaced. Under federal patent law, the right to an invention belongs to the inventor. Bd. of Trustees of Leland Stanford Jr. Univ. v. Roche Molecular Sys. Inc., 563 U.S. 776, 785, 131 S. Ct. 2188, 180 L. Ed. 2d 1 (2011). An employer has no rights to an employee's invention absent a

written agreement to the contrary. Id. Patent law recognizes that an employer may obtain "shop rights" in an employee's invention "where it has contributed to the development of the invention." Teets v. Chromalloy Gas Turbine Corp., 83 F.3d 403, 407 (Fed. Cir. 1996). But shop rights do not transfer ownership of an invention from employee to employer. It merely grants to the employer a non-transferrable, non-exclusive, royalty-free right permitting the employer to use an invention developed by its employee on the job. Marley Co. v. FE Petro, Inc., 38 F. Supp. 2d 1070, 1083 (S.D. Iowa 1998). And shop rights attach only when there is no specific contractual provision providing for the assignment of intellectual property. U.S. v. Dubilier Condenser Corp., 289 U.S. 178, 187-88, 53 S. Ct. 554, 77 L. Ed. 2d 1114 (1933). The common law "shop right" doctrine is superseded when parties allocate their rights to inventions by contract. Marley, 38 F. Supp. 2d at 1083; Jamesbury Corp. v. Worcester Valve Co., 443 F.2d 205, 214 (1st Cir. 1971).

In this case, unlike Wellington, there was an express agreement, as amended to comply with RCW 49.44.140, setting out under what circumstances Citrix would obtain ownership to Khalid's inventions. The existence of this invention assignment agreement supersedes any common law claim of shop rights. The trial court did not err in relying on the jury's verdict to conclude that Citrix has no ownership rights to the '219 or '637 Patents.

### 7. Remittitur of the $3 Million Damages Award

Citrix next argues the trial court should have either remitted the $3 million damage award or granted it a new trial on damages. It contends the verdict is not

supported by the evidence and the jury must have erroneously added interest to the damages award. We disagree.

The determination of the amount of damages is "primarily and peculiarly within the province of the jury, under proper instructions, and the courts should be and are reluctant to interfere with the conclusion of a jury when fairly made." Bingaman v. Grays Harbor Community Hosp., 103 Wn.2d 831, 835, 699 P.2d 1230 (1985). If a jury's verdict is tainted by passion or prejudice or is otherwise excessive, the trial court or the appellate court has the power to reduce the award or to order a new trial. But there is a strong presumption in favor of a jury's determination of damages. Sofie v. Fibreboard Corp., 112 Wn.2d 636, 654, 771 P.2d 711 (1989). "A judge can only reduce a jury's damages determination when it is, in light of this strong presumption, wholly unsupported by the evidence, obviously motivated by passion or prejudice, or shocking to the court's conscience." Id. at 654-55.

We review a trial court's order denying remittitur or the denial of a motion for a new trial for abuse of discretion. Bunch v. King County Dep't of Youth Servs., 155 Wn.2d 165, 176, 116 P.3d 381 (2005); State v. Boyle, 183 Wn. App. 1, 12, 335 P.3d 954 (2014). "A court abuses its discretion when its decision adopts a view that no reasonable person would take or that is based on untenable grounds or reasons." Boyle, 183 Wn. App. at 12-13.

Citrix does not contend the jury's $3 million award was the result of passion or prejudice or is so large as to shock the conscience of the court. Instead, it claims the record does not support this award because no witness testified that $3 million

was the proper amount of damages for its breach. While a claimant bears the burden of proving the amount of damages, this burden does not require mathematical certainty or precision; there need only be competent evidence in the record to support the damage award. Fed. Signal Corp. v. Safety Factors, Inc., 125 Wn.2d 413, 443, 886 P.2d 172 (1994).

There is ample evidence in this record to support the jury's award. Khalid presented the testimony of two experts regarding the loss of business development opportunities resulting from Citrix's assertion of ownership over his intellectual property. John Forbes, a computer scientist and venture capitalist responsible for founding several successful startup companies, testified that Softlock, was in "an advance[d] stage of development," and Khalid had a commitment from Pragma to purchase 50,000 licenses to this software. Forbes opined that Citrix's assertion of ownership to the intellectual property behind Softlock led Khalid to lose this business opportunity. He projected that Khalid lost revenue of $35 million based on Citrix's claim to the '219 and '637 Patents.

Lorraine Barrick, a certified forensic accountant specializing in damages estimates, testified that she valued the lost revenue from the Pragma sale of 50,000 licenses to fall between $1,485,000 and $1,905,381. Barrick further testified that had Softlock sales continued at a rate of approximately 25,000 per year, Khalid would have had net sales revenue of $4.24 million over a five-year period. Barrick testified that Khalid's combined lost business opportunities for both the Softlock and mini-cloud inventions between November 2011 and December

2016 ranged from $11.9 million and $17.8 million. The jury's award of $3 million clearly falls within the range of this evidence.

Citrix argues the jury could only have reached a $3 million award by applying 12 percent prejudgment interest compounded from 2011 to 2018. It notes that Barrick testified that Khalid's lost Pragma sales revenue, with 12 percent interest added in, would total $2,848,821. It suggests the jury erroneously accepted Barrick's damages testimony and rounded up to reach the $3 million number. But this argument is speculative at best. Barrick testified that Khalid's lost sales of Softlock would likely have averaged $1,695,191 in the first year and would have reached $4,237,000 over the first five years. The jury was free to decide that Khalid's actual losses were somewhere in between these two numbers. We cannot conclude that the jury's award included prejudgment interest.

The trial court did not abuse its discretion in denying Citrix's motion for remittitur or in denying its motion for a new trial.

8. Khalid's Request for Prejudgment Interest on the $3 Million Award

Khalid argues the trial court erred in denying his request for prejudgment interest on the $3 million jury award for breach of the Employment Agreement. We agree.

This court reviews a trial court's order on prejudgment interest for abuse of discretion. Humphrey Indus., Ltd. V. Clay Street Assocs., 176 Wn.2d 662, 672, 295 P.3d 231 (2013). The court will reverse a trial court's decision only if it is manifestly unreasonable, exercised on untenable grounds, or exercised for untenable reasons. Id. Untenable reasons include errors of law. Id.

- 57 -

The parties agree Florida law governs Khalid's entitlement to prejudgment interest. In Florida, prejudgment interest is an element of pecuniary damages. Argonaut Ins. Co. v. May Plumbing Co., 474 So. 2d 212, 214 (Fla. 1985). Once a jury has reached its verdict, the plaintiff's damages are deemed liquidated and the plaintiff is legally entitled to an award of prejudgment interest as long as the date of loss can be ascertained from the evidence. Arizona Chemical Co. v. Mohawk Indus., Inc., 197 So. 3d 99, 102-103 (Fla. Dist. Ct. App. 2016). Two prerequisites are required for an award of prejudgment interest: out-of-pocket pecuniary loss and a fixed date of that loss. Glover Distributing Co., Inc. v. F.T.D.K., Inc., 816 So. 2d 1207, 1213 (Fla. Dist. Ct. App. 2002). There does not have to be a special verdict determining the actual date of loss when the loss is established by the verdict and the pertinent date can be ascertained from the evidence. Pace Prop. Fin. Authority v. Jones, 24 So. 3d 1271, 1272 (Fla. Dist. Ct. App. 2009).

The trial court denied prejudgment interest, finding that Khalid had not established a precise date of loss.

> Under Florida law, a party seeking an award of prejudgment interest must conclusively establish a date of pecuniary loss before prejudgment interest can be awarded. Under these facts, the court cannot ascertain a date of actual loss for the lost profits of the business. Plaintiff argued the date of loss was based on the testimony of their expert, Lorraine Barrick, who testified regarding her methodology and calculated projected future income using November 1, 2011 as a starting date. The court cannot anchor a 3 million dollar loss five days after Citrix sent its letter alerting plaintiff to its claim to the patents. Given the facts presented, it is simply not logical that the plaintiff would have lost 3 million dollars by that date. The court cannot logically ascertain a different date. Moreover, the plaintiff did not request the jury to ascertain a date of loss. Given the facts presented, the court cannot ascertain a specific date of loss; the request for prejudgment interest is denied for the $3,000,000 award.

Khalid argues the trial court erred in concluding that his date of loss could not be ascertained from the evidence at trial. He maintains that his date of loss was November 1, 2011, the date on which he would have been able to market his inventions but for Citrix's assertion of ownership to that intellectual property. He contends Barrick computed Khalid's lost profits using a standard methodology of discounting a total, multi-year profit stream to a present day value. Id. He contends under Arizona Chemical, when there is expert witness testimony applying this methodology, the date to which the lost profit stream is discounted is the actual date of loss. Arizona Chemical does not support this argument.

In that case, a carpet manufacturer, Mohawk, sought damages from a resin manufacturer, Arizona Chemical, after discovering that the resin Arizona Chemical supplied and Mohawk applied to its carpet backing was failing. Arizona Chemical, 197 So. 2d at 102. Mohawk used the resin for four years before discovering the defect. Id. at 101. It experienced a spike in warranty claims for several years and, after discovering the defect, sold some of the remaining carpet at a discount and discarded the rest. Id. at 102. The brand suffered as a result of the high level of warranty claims and ultimately Mohawk had to discontinue it. Id. at 101. It sought expenses incurred in fulfilling customer warranty claims and lost profits due to the declining sales of the carpet and the ultimate demise of the brand. Id.

After a jury verdict in Mohawk's favor, the trial court sought to award Mohawk prejudgment interest from the date of Arizona Chemical's breach but could not determine that date it delivered the defective resin to Mohawk. It instead chose to start interest from the date Mohawk applied the resin to each roll of carpet

subject of a warranty claim, discarded or sold at a lower price. Id. at 102. The Florida appellate court held that "the beginning date for the accrual of prejudgment interest depends on the timing of the pecuniary loss for which damages have been awarded." Id. at 104. It held:

> In the instant case, Mohawk sued to recover for losses that occurred after the date Arizona breached the parties' contract and its warranty. Often, Mohawk sustained these losses years later, when it paid warranty claims on carpet that had been installed for some time before the defects surfaced. In some cases, Mohawk may have realized the losses closer to the time of breach, but still later than the breach, when it made the decision to dispose of carpet without receiving full price rather than risk warranty claims on it. Under these circumstances, Mohawk was not entitled to recover prejudgment interest from the date the defective resin was delivered or applied to the carpet. Rather, Mohawk was entitled to recover prejudgment interest from the date it realized each loss in dollars.

Id. at 105. Because the relevant dates for determining when prejudgment interest began to accrue were the dates Mohawk paid out on warranty claims, sold carpet at a discount or discarded carpet, the court remanded the case to the trial court to determine if these dates could be ascertained from the evidence. Id. at 106. It also stated, however, that "if the dates of Mohawk's losses cannot be ascertained with precision, the court should select, as to each loss, the earliest date by which the evidence shows the loss must have been sustained." Id.

There is no discussion in Arizona Chemical about when prejudgment interest accrues on lost profits incurred over a multi-year period or how accrual should be analyzed when an expert estimates a lost profit stream over several years. Arizona Chemical does not support Khalid's argument for prejudgment interest commencing on November 1, 2011.

- 60 -

Nevertheless, <u>Arizona Chemical</u> does support the argument that when damages accrue at different times, prejudgment interest should be awarded from the date of each incremental loss. Damages can become fixed on different dates for purposes of an award of prejudgment interest. <u>Capitol Envt'l Servs., Inc. v. Earth Tech, Inc.</u>, 25 So. 3d 593, 597 (Fla. Dist. Ct. App. 2009). The problem with this argument, however, is that Khalid presented different damage theories to the jury and the verdict does not indicate which theory the jury adopted.

Forbes estimated lost revenues of $35 million between 2011 and 2015. Barrick calculated lost sales to Pragma of between $1.7 million and $4.2 million between 2011 and 2016. She estimated total lost sales between November 2011 and the end of 2016 to be $15.2 million. It is possible to compute interest on these lost sales; Barrick provided the court with interest computations associated with the Pragma sales.

But Barrick also presented evidence as to the diminution in value of Khalid's ownership interest in the company he formed to market his inventions of between $10.8 million and $16 million. The jury's $3 million award could reflect lost profits from the anticipated Pragma sale for some portion of the five-year period outlined by the experts or it could reflect a diminution in value of the company Khalid formed, or some combination of both. From this record, the trial court was correct in concluding that it could not ascertain precisely that dates on which Khalid sustained the losses awarded by the jury.

But the date of loss does not need to be ascertained "with precision." <u>Arizona Chemical</u>, 197 So. 3d at 106. Under Florida law, if no other date is

discernable from the record, a trial court should award prejudgment interest from the latest possible date of loss. In Berloni S.p.A. v. Della Casa, LLC, 972 So. 2d 1007 (Fla. Dist. Ct. App. 2008), a supplier of kitchens and bathrooms sued a buyer for nonpayment. Id. at 1009. A Florida appellate court held that when a contract dispute relates to the amount of money owing under that contract, the date of loss for prejudgment interest purposes is the date on which payment becomes due to the plaintiff and if the plaintiff made no pre-suit demand for payment, that date of loss should be the date the plaintiff filed its lawsuit. Id. at 1012. Because "the filing of the complaint unequivocally constituted a demand for payment," the appellate court decided prejudgment interest should be calculated from that date. Id. See also SEB S.A. v. Sunbeam Corp., 148 Fed. Appx. 774, 795 (11th Cir. 2005) (under Florida law, prejudgment interest can be awarded properly from the latest possible date of loss); Specialized Transp. of Tampa Bay, Inc. v. Nestle Waters North America, Inc., 356 Fed. Appx. 221, 231 (11th Cir. 2009) (district court did not abuse discretion in awarding prejudgment interest as of the latest possible date of loss).

At trial, Khalid presented evidence of damages accruing no later than the date of Barrick's December 2016 report. The latest date on which Khalid presented evidence of loss was the end of December 2016 and the trial court erred in not awarding prejudgment interest from that date.

Citing Citizens Property Ins. Corp. v. Nunez, 194 So. 3d 1064, 1071 (Fla. Dist. Ct. App. 2016), Citrix contends that a plaintiff is not entitled to prejudgment interest when there is no basis for determining a "fixed" date of loss. But Nunez is distinguishable. In that case, Nunez experienced a sinkhole loss and sought

insurance coverage for the costs of making subsurface repairs to the home. Id. at 1066-67. When the parties reached an impasse on the amount it would take to cover repairs, Nunez sued for breach of contract. The jury was asked to decide the total cost necessary to properly stabilize the land and building and to repair the foundation. Id. at 1067. The jury returned a verdict for Nunez and awarded $100,000 for subsurface repair damages. Id. As to prejudgment interest, the court held Nunez was not entitled to prejudgment interest because there was no factual determination establishing a date of loss earlier than the date of the jury's verdict. Id. at 1071.

In Nunez, the appellate court noted that Nunez had not contracted for any subsurface repairs as of the date of trial. Id. at 1069. It is clear from the facts of that case that the date of loss was the date of the verdict because that was the date the jury determined the amount it would take for Nunez to repair the damage to his property at some point in the future. The holding in Nunez is consistent with other Florida case law holding that prejudgment interest is not available when damages are based on future anticipated losses. Checkers Drive-In Rests., Inc. v. Tampa Checkmate Food Serv., 805 So. 2d 941, 945 (Fla. Dist. Ct. App. 2001).

Here, Khalid's theory of damages was not based on lost future sales or future profits but was instead based on historical lost sales during a five-year period between the date Citrix first claimed to own his inventions in late October 2011 and the date of Barrick's report in December 2016. The jury rendered its verdict in 2018, some two years after this period of loss. Citrix's reliance on Nunez is thus misplaced.

The trial court cited to <u>Citizens Prop. Ins. Corp. v. Alvarez</u>, 198 So. 3d 45 (Fla. Dist. Ct. App. 2016) and <u>Citizens Prop. Ins. Corp. v. Cabrera</u>, 197 So. 3d 72 (Fla. Dist. Ct. App. 2016) for the proposition that the party seeking prejudgment interest must "conclusively establish a date of pecuniary loss before prejudgment interest can be awarded." But both <u>Alvarez</u> and <u>Cabera</u>, like <u>Nunez</u>, related to insureds' claims against an insurer for refusing to pay the cost to repair sinkholes. In both cases, as in <u>Nunez</u>, the courts concluded that there was no indication that the jury was determining the amount of loss for a date other than the date of the verdict. <u>Alvarez</u>, 198 So. 3d at 46; <u>Cabera</u>, 197 So. 3d at 73. The court in <u>Alvarez</u> explicitly noted "[w]e do not rule out the possibility that such a claim could be presented to a jury in a manner that might allow for prejudgment interest. It simply was not presented in such a matter in this case." 198 So. 3d at 46. Because the jury verdicts in <u>Nunez</u>, <u>Alvarez</u> and <u>Cabrera</u> established the insurer's future liability for their insureds' sinkhole claims, and was not intended to determine the amount of money needed to reimburse these insureds for out-of-pocket losses, it makes sense that the insureds were not entitled to prejudgment interest.

But the jury award here was not to establish Citrix's monetary liability for future expenses Khalid would incur to develop or market his inventions. It was instead to compensate Khalid for losses he sustained in the past. The record demonstrates that Khalid invested years of his life developing these two inventions. He wrote software code, tested and validated it, prepared provisional and final patent applications for each, hired computer software engineers in Bangladesh to assist him in finalizing the coding, and prepared business plans to attempt to attract

investors. He estimated he invested thousands of hours of his life to these projects. He spent thousands of dollars on computer equipment over a period of several years. His Softlock program was fully functional by the end of 2008 and he made it available through his company's website. Thousands of people downloaded trial copies of the program for free. When he left Citrix's employ in October 2011, Softlock remained available in the market in beta form. The mini-cloud system was in the early stages of prototype development and not ready to release to the market. But Khalid had a team building the prototype and he had located a company in California to fabricate the thin terminal.

Once Citrix asserted an ownership interest in these two inventions, Khalid was unable to continue marketing either product. He could not attract investors in his startup company with clouds on the title to his patents. Forbes testified that before October 2011, Khalid had the credentials that investors would find interesting. He had a master's degree in computer science and had worked for at least eight years at Microsoft. He had recruited an experienced chief executive officer to take over the management of his startup. Forbes also testified that the market sectors for both computer security software and cloud computing were particularly good in 2011, with a significant amount of venture capital money available for the type of software Khalid had developed. But when Citrix asserted that Khalid's patents belonged to the company, he lost his prospective CEO, investors, and his contract with Pragma. His startup essentially collapsed. In Forbes's opinion, "[i]t's extremely hard to assemble all the factors to launch a

startup company. For Mr. Khalid to do so given the present time would be extremely difficult, if not impossible."

Unlike the insureds in Nunez, Alvarez or Cabera, Khalid presented evidence of past losses occurring between November 2011 and the date he filed his complaint in October 2015. Because Khalid's complaint demanded payment for lost profits and lost value in his startup companies, and Citrix conceded below that the date he filed his complaint was the last possible date he incurred loss, the trial court should have awarded Khalid prejudgment interest based on the evidence presented at trial, establishing losses through December 2016. We reverse and remand for an award of prejudgment on the $3 million jury verdict from the date of Barrick's report in December 2016 to the date of judgment.

9. Prejudgment Interest Rate

Khalid next contends the trial court erred in applying Florida's prejudgment interest rate of 4.75 percent rather than Washington's rate of 12 percent to the jury's award for breach of the Severance Agreement. We disagree.

This court reviews de novo a trial court's decision regarding its conflict of law analysis. Williams v. Leone & Keeble, Inc., 170 Wn. App. 696, 704, 285 P.3d 906 (2012). When resolving disputes concerning choice of law, the court must decide (1) whether there is an actual conflict of laws and, if so, (2) whether the parties' agreement's choice of law provision is effective. Shanghai Commercial Bank Limited v. Kung Da Chang, 189 Wn.2d 474, 480, 404 P.3d 62 (2017).

Here, there is an actual conflict between Washington and Florida law. Under RCW 4.56.110(6) and RCW 19.52.020(1), judgments in Washington bear

interest at the rate of 12 percent.  In Florida, however, interest is set quarterly by the Chief Financial Officer by averaging the discount rate of the Federal Reserve Bank of New York for the preceding 12 months and then adding 400 basis points to the averaged federal discount rate.  Fla. Stat. Ann. § 55.03(1).  The interest rate is set at the time the judgment is entered and is adjusted annually each January in accordance with the interest rate in effect on that date until the judgment is paid.  Fla. Stat. Ann. § 55.03(3).  The interest rate in October 2015 was 4.75 percent.[16]

Given this actual conflict, the analysis turns to whether the parties' contractual choice of law is effective.  Shanghai, 189 Wn.2d at 482.  In Shanghai, the Supreme Court relied on the Restatement (Second) of Conflict of Laws §187 (1971) which provides:

> (1)  The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

Here, the parties expressly provided in Khalid's Employment Agreement that "this Agreement will be governed by and construed and enforced in accordance with the laws of the State of Florida." (Emphasis added).  In Shanghai, the Supreme Court addressed whether a similar contractual choice of law clause, designating Hong Kong law, governed whether the judgment debtor's community property could be reached to satisfy a judgment entered in that jurisdiction.  Shanghai, 189 Wn.2d at 480.  It held that the specific inclusion of the word

---

[16] Florida Department of Financial Services, Historical Judgment Interest Rates, https://www.myfloridacfo.com/Division/AA/LocalGovernments/Historical.htm (last visited November 6, 2020).

"enforcement" in a choice of law provision fulfilled the specificity requirement of subsection (1) of § 187 and made that choice of law effective. Id. at 484. It affirmed the trial court's determination that the debtor's community property could be reached to satisfy the foreign judgment.

In Florida, prejudgment interest is considered an element of pecuniary damages. Argonaut, 474 So. 2d at 214. The Florida Supreme Court has held "when a verdict liquidates damages on a plaintiff's out-of-pocket, pecuniary losses, plaintiff is entitled, as a matter of law, to prejudgment interest at the statutory rate from the date of that loss." Id. at 215. Khalid's lawsuit sought to vindicate his contractual rights, one element of which would be compensation for Citrix's breach. His lawsuit is no less an effort to "enforce" his contractual rights than was the judgment creditor's lawsuit in Shanghai. Under this analysis, there is no basis for applying any state's law other than the law of the state chosen by these contracting parties.

Khalid argues, however, that while entitlement to prejudgment interest is a matter of substantive law governed by Florida law, the rate to be applied is purely procedural in nature, governed by the law of the forum state under the Restatement (Second) Conflicts of Law §122 (1971). This provision provides:

> A court usually applies its own local law rules prescribing how litigation shall be conducted even when it applies to local law rules of another state to resolve other issues in the case.

Washington courts follow this provision of the Restatement. Boudreaux v. Weyerhaeuser Co., 10 Wn. App. 2d 289, 313 n. 14, 448 P.3d 121 (2019) (Washington procedural law governed the mechanism through which company

should have asserted immunity in a Washington court); In re Marriage of Ulm, 39 Wn. App. 342, 345, 693 P.2d 181 (1984) (Washington as forum state may apply its own statute of limitations to actions seeking to enforce foreign judgments). But there is no reported Washington case applying section 122 to the question of whether the interest rate to apply to a judgment should be governed by the parties' contractual choice of law or the law of the forum state.

The cases on which Khalid relies do not support his argument. Khalid cites Townsend v. R.J. Reynolds Tobacco Co., 192 So. 3d 1223 (Fla. 2016) for the proposition that the Florida statute granting a judgment creditor the right to prejudgment interest does not grant a substantive right to any particular interest rate. He suggests Washington law is consistent with Townsend, citing Paul v. All Alaskan Seafoods, 106 Wn. App. 406, 24 P.3d 447 (2001). Neither Townsend nor All Alaskan Seafoods supports Khalid's argument.

In Townsend, the Florida Supreme Court addressed whether R.J. Reynolds owed the plaintiff postjugment interest on a judgment at a rate of 6 percent or the rate of 4.75 percent because of an intervening statutory amendment to Fla. Stat. Ann. § 55.03. Townsend, 192 So. 3d at 1224. At the time the trial court entered the judgment, Florida's statute provided that "the interest rate established at the time a judgment is obtained shall remain the same until the judgment is paid." Fla. Stat. Ann. § 55.03(3) (2010). But after R.J. Reynolds' appeal, and a remittitur of the judgment, an amended judgment for $25 million was entered in 2012. Id. at 1224. In the interim, the Florida legislature had amended the statute, effective July 1, 2011, so that the interest rate became subject to annual adjustment on January

1 of each year. Id. at 1224-25. The court held that the 2010 version of Fla. Stat. Ann. § 55.03(3) was substantive in nature rather than procedural or remedial. Id. at 1229. As a result, Townsend's substantive right to prejudgment interest at a fixed rate vested in 2010 when the original judgment was entered. Id. at 1230. It held that once the legislature granted such a substantive right, it could not remove it through subsequent amendment without violating the Florida Constitution. Id.

Khalid relies on a quote from the case in which the Florida Supreme Court stated that "[t]he substantive right created by the 2010 version of section 55.03(3) is simply the right to a fixed rate of interest for the life of the judgment, not the right to interest or to a particular rate of interest." Id. But this statement, read in context, does not mean that the applicable statutory interest rate is an issue of procedural, rather than substantive, law. The Florida statute – both before and after the 2011 amendment – did not set a specific interest rate. The 2010 version of the statute provided that "the interest rate established at the time a judgment is obtained shall remain the same until the judgment is paid." Id. at 1226. The court analyzed whether this statutory provision created a vested, substantive right. Townsend actually supports Citrix's contention that Florida's statute on calculating interest is a matter of substantive, not procedural, law. See also Blitz Telecom Consulting, LLC v. Peerless Network, Inc., 212 F. Supp. 3d 1232, 1240 (M.D. Fla. 2016) (Florida considers both the entitlement to prejudgment interest and the applicable rate to be matters of substantive law; parties' choice of law in contract governs interest rate).

- 70 -

In All Alaskan Seafoods, this court addressed whether federal maritime law preempted Washington wage statutes in a claim of willful withholding of fishermen's wages. All Alaskan Seafoods, 106 Wn. App. at 409. The court concluded that Washington's statutory double wage provision did not conflict with federal maritime law and applied. Id. at 422. All Alaskan Seafoods also challenged the award of prejudgment interest at the state rate of 12 percent. Id. at 427. This court held Washington law governing prejudgment interest conflicted with maritime law and was preempted by it. Id. But it also concluded that there was a lack of uniformity in federal courts regarding the applicable rate, with some federal courts applying a Treasury bill rate and others leaving it to the discretion of the district courts to determine the most appropriate rate. Id. at 429-30. Citing Ninth Circuit maritime precedent, the court held "[i]n the absence of a uniform rule, the rate to be applied is a matter for the sound discretion of the trial court. Id. at 430. It concluded the trial court had not abused its discretion in applying Washington's statutory rate. Id.

All Alaska Seafoods does not support Khalid's argument that the Washington interest rate applies to his breach of contract claim in which the parties agreed to apply Florida law. Its holding is clearly limited to the context of federal maritime law.

Because the parties chose Florida as the law to apply in any action to enforce their contractual rights under the Employment Agreement, and that provision is effective, prejudgment interest must be awarded at Florida's interest

rate. The trial court did not err in rejecting Khalid's request to apply Washington's interest rate to prejudgment interest.

10. Citrix's Request for Disgorgement of Khalid's Lost Profits Award

Citrix next argues that this court should order disgorgement of Khalid's $3 million award because these damages are attributable to his trademark infringement. We refuse to address this argument on its merits because Citrix did not properly preserve the issue for appeal.

At trial, Citrix argued that it was entitled to damages, including disgorgement of profits, for Khalid's violation of the Lanham Act. The jury was instructed as follows:

> In addition to actual damages, Citrix is entitled to any profits earned
> by Khalid that are attributable to the infringement, which Citrix proves
> by a preponderance of the evidence.

The jury rejected Citrix's claim and found Khalid's infringement caused Citrix no damages. Citrix did not assign error to the jury's verdict.

If a respondent seeks affirmative relief on appeal, as distinguished from urging additional grounds for affirmance, a notice of cross review is required. State v. Sims, 171 Wn.2d 436, 442-43, 256 P.3d 285 (2011). Citrix filed a notice of appeal and designated five assignments of error, none of which related to its request for disgorgement of Khalid's profits under the Lanham Act.

Citrix contends that it is entitled to raise this issue for the first time in Khalid's appeal under RAP 2.4(a). RAP 2.4(a) allows this court to consider a respondent's request for affirmative relief when that respondent has failed to file a cross appeal "if demanded by the necessities of the case." Washington courts generally apply

this provision of RAP 2.4(a) only when a petitioner's claim cannot be considered adequately from the issues a respondent raises in response. Sims, 171 Wn.2d at 444.

Citrix's disgorgement argument on appeal could have been considered separately from any assignments of error Khalid raised in his appeal. As a result, we decline to consider the argument under RAP 2.4(a).

11. Attorney Fee Award to Khalid

Citrix next contends the trial court erred in awarding any attorney fees to Khalid because there is no applicable attorney fee provision in the Employment Agreement and the severance pay awarded under the Severance Agreement does not constitute "wages" under RCW 49.48.030. We reject both arguments.

A trial court may award attorney fees only when authorized by statute, contract, or recognized ground of equity. Panorama Vill. Condo. Owners Ass'n Bd. of Dirs. v. Allstate Ins. Co., 144 Wn.2d 130, 143, 26 P.3d 910 (2001). Whether a trial court is authorized to award attorney fees is a question of law reviewed de novo. Gander v. Yeager, 167 Wn. App. 638, 646, 282 P.3d 1100 (2012). When attorney fees are authorized, we will uphold the attorney fee award absent a manifest abuse of discretion. Mahler v. Szucs, 135 Wn.2d 398, 435, 957 P.2d 632 (1998) (overruled on other grounds by Matsyuk v. State Farm Fire & Cas. Co., 173 Wn.2d 643, 272 P.3d 802 (2012)). A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds. Mayer v. Sto Indus., Inc., 156 Wn.2d 677, 684, 132 P.3d 115 (2006).

The trial court concluded Khalid was entitled to attorney fees under section 8 of the Employment Agreement. Section 8, entitled "Notice to Future Employers and of Future Employment," provides that, during Khalid's employment with Citrix and for a period of 12 months afterwards, Khalid would "notify Citrix in writing of any subsequent engagement, occupation or employment" and his "duties and responsibilities with respect to any such position." Section 8 contained an attorney fee provision:

> I agree and acknowledge that violation of this Section 8 shall entitle Citrix to bring suit against me for specific performance and, if appropriate, injunctive relief and damages, without Citrix being required to show any actual damage or to post an injunction bond. Should Citrix establish that I have violated the terms of this Section 8 by failing to provide proper notice, Citrix shall be deemed the prevailing party in any such litigation and entitled to recover its attorney fees and costs incurred therein.

The trial court concluded that this unilateral fee provision was made bilateral by operation of Florida law, Fla. Stat. § 57.105(7) and RCW 4.84.330.

Although much of the case involved the Invention Assignment Clause, which does not contain an attorney fees provision, the trial court concluded that Citrix had asserted a cause of action for breach of contract, had alleged Khalid failed to notify Citrix of his involvement with XenCare and PcXen as required by section 8, and presented evidence to the jury that Khalid could not prevail on his claim of breach of contract because he had not performed all of the essential terms of the Employment Agreement, including those required by section 8. It reasoned:

> In effect, Citrix made Khalid's compliance with paragraph 8 an element of his breach of contract claim. Thus, to prevail on his claim for breach of the Confidentiality Agreement, Khalid had to prove he did not materially breach the contract to overcome this defense. See Jury Instruction No. 15. Khalid prevailed on the cause of action and the jury awarded him damages for Citrix's breach of the Confidentiality

- 74 -

Agreement. He is therefore contractually entitled to recover attorneys' fees and expenses incurred in proving his cause of action for breach of contract and defeating Citrix's claim of breach of contract.

Citrix contends neither it nor Khalid ever raised section 8 to the jury as a basis for the breach of contract claim. The record does not support Citrix's argument. Citrix's consistent position was that Khalid breached section 8 of the Employment Agreement. In its motion for summary judgment, Citrix stated:

Eventually, Xencare assumed the role of PcXen as well. Khalid served as the sole proprietor and was employed as the chief technology officer of each business. . . . He did not disclose this information to Citrix during his employment despite a requirement in the Agreement that he do so.

Citrix asserted a breach of section 8 in its trial brief:

Khalid violated the Agreement in the following ways: Khalid's Agreement required Khalid to disclose in writing the terms of any employment by a third-party while employed by Citrix. Unbeknownst to Citrix, while employed by Citrix, Khalid was devoting substantial amounts of time to developing his own personal businesses, Xencare and PcXen. He did not disclose this information to Citrix during his employment despite the Agreement's requirement that he do so.

And Citrix proposed a jury instruction that provided, in relevant part

The Agreement contained several provisions that Khalid and Citrix claim the other breached. . . . The Agreement also required Khalid disclose in writing any outside business interests during his employment with Citrix and for 12 months following the end of his employment. That disclosure must include a description of any subsequent engagement, occupation or employment, whether as owner, employee, officer, director, agent, consultant, independent contractors or the like, and the duties and responsibilities with respect to any such position. . . . Citrix also claims Khalid breached the Agreement by failing to disclose his outside business interests to Citrix as required by the Agreement.

Citrix clearly raised section 8 as a basis for defeating Khalid's claims against it and for asserting claims against him.

The trial court also correctly concluded that for Khalid to prevail on his claim of breach of contract, and defeat Citrix's counterclaim, Khalid had to prove that he "did all, or substantially all, of the essential things which the contract required him to do or that he was excused from doing those things." Khalid presented evidence that he had disclosed his outside business activities with Xencare and PcXen to Citrix. And Khalid argued in closing argument that he had not breached section 8:

> Citrix also claims, because they are trying to come up with ways to avoid what Exhibit B means, that he had failed to disclose the fact that he worked for another company in violation of another paragraph of the agreement, paragraph eight, I believe.
>
> And they made much of the fact that he hadn't disclosed the fact that he worked for other companies but that's not true. Abolfazl Sirjani, again, . . . says that he was aware that he was working with KrisanTech, the name Khalid used for his business before he switched over to XenCare at or about the time that he came to work at Citrix. Mr. Sirjani testified that he saw Khalid's business plan for KrisanTech at or about the time Khalid came to work at Citrix.
>
> And you have seen all of these presentations that were made at Citrix in which Khalid was explaining that he had his company, and he was getting it going. So to the extent that Citrix wanted him to disclose the fact that he was involved with another company, he did so. And he did so repeatedly. . . . Mr. Duursma testified that he was suggesting managerial types to assist Mr. Khalid with his businesses. So Citrix's complaints that Khalid didn't disclose his involvement with another employer are simply an effort by Citrix to avoid the contract terms it wants to avoid.

Although Citrix did not explicitly refer to section 8 in its arguments to the jury, it presented evidence from Citrix employees like Pederson that Khalid did not disclose Xencare, or PcXen to the company. And it argued in closing that Khalid breached the Employment Agreement by failing to use his best efforts on behalf of Citrix, engaging in outside business activities that interfered with his job duties, using Citrix confidential information for his own gain, and refusing to assign developments to

Citrix. The jury disagreed, finding that Khalid did not breach the Employment Agreement.

Because Citrix invoked section 8 repeatedly as a basis for defeating Khalid's claims and as a basis for its own breach of contract counterclaim, and because Citrix then argued at trial that Khalid could not prevail on his own claim of breach of contract because he had not performed all of the essential terms of the Employment Agreement, the trial court did not err in concluding that Citrix put Khalid in a position of having to prove his compliance with section 8 as an element of his breach of contract claim or in concluding that Khalid was entitled to an award of attorney fees pursuant to section 8.

Nor did the trial court err in concluding that the jury's severance pay award triggered the attorney fee provision of RCW 49.48.030. RCW 49.48.030 provides that: "In any action in which any person is successful in recovering judgment for wages or salary owed to him or her, reasonable attorney's fees, in an amount to be determined by the court, shall be assessed against said employer or former employer." The trial court concluded that Khalid's severance pay constitutes "wages or salary owed to him" under this statute.

Statutory interpretation is a question of law that we review de novo. State v. Evergreen Freedom Found., 192 Wn.2d 782, 789, 432 P.3d 805 (2019) (plurality opinion). When engaging in statutory interpretation, we endeavor to determine and give effect to the legislature's intent. Jametsky v. Olsen, 179 Wn.2d 756, 762, 317 P.3d 1003 (2014). In determining the legislature's intent, we must first

examine the statute's plain language and ordinary meaning.[17]  Id.  Legislative

definitions included in the statute are controlling.  State v. Econ. Dev. Bd., 9 Wn.

App. 2d 1, 10, 441 P.3d 1269 (2019).  "Wages" are defined, for the purposes of

RCW 49.48.030, as "compensation due to an employee by reason of employment."

RCW 49.46.010(7).

In Durand v. HMC Corp., 151 Wn. App. 818, 214 P.3d 189 (2009), this court

held that severance pay can constitute compensation due to a departing employee

under an employment agreement because the term "compensation" applies to

more than work actually performed.  Id. at 831.  "[I]t applies to any form of

compensation that is a byproduct of the employment relationship."  Id.

The Severance Agreement provided:

> Whereas, Employee's employment has been terminated due to Company and Employee determining that terminating the employment relationship is of mutual benefit.

> Whereas, the Company desires to extend certain separation benefits to Employee to assist Employee with the transition to new employment, and in return, Employee has agreed to release the Company from any claims arising from or related to the employment relationship;

> NOW THEREFORE, in consideration of the mutual promises made herein, the Company and Employee . . .  hereby agree as follows:

> 1. Final Date of Employment.  Employee's employment with the Company will end on October 3, 2011 ("Final Date of Employment").  On the Final Date of Employment, Company will pay all salary, wages, bonuses, accrued PTO (paid time off), if any, in accordance with Company Policy, and any and all other benefits due

---

[17] RCW 49.48.030 is a remedial statute and we will construe it liberally in favor of the employee. McGinnity v. AutoNation, Inc., 149 Wn. App. 277, 284, 202 P.3d 1009 (2009) (citing Int'l Ass'n of Fire Fighters, Local 46 v. City of Everett, 146 Wn.2d 29, 34, 42 P.3d 1265 (2002)). See also Schilling v. Radio Holdings, Inc., 136 Wn.2d 152, 159, 961 P.2d 371 (1998) (this court construes the statute liberally in order to "protect employee wages and assure payment.")

to Employee through the Final Date of Employment. To the extent Employee is owed any incentive compensation payment, such payment shall be made in accordance with the terms of such incentive compensation plan.

2. <u>Consideration</u>. Providing Employee has fully complied with the terms of this Agreement, including but not limited to <u>Section 5</u> below, within fifteen (15) business days following the latter of the Final Date of Employment or the Effective Date (as defined in <u>Section 19</u> below) Company will provide:

a. Employee separation compensation in the form of a lump sum payment equal to $30,757 (the equivalent of 11 weeks base salary). Customary payroll taxes and income tax withholdings will be deducted from the separation compensation lump sum payment . . ..

Citrix's company policy provides for a fixed amount of severance pay based on the reason for termination, the employee's length of service, and the employee's salary range. An employee receives a payment equal to a certain number of weeks of base pay based on their salary range; they also receive an additional week of pay per year of employment if the termination was a "mutual separation," or an additional two weeks of pay per year of employment if the termination was a "job elimination." Citrix employees are not entitled to severance pay if they are involuntarily terminated.

DeForeest, Khalid's direct supervisor when he was terminated, testified that he advocated for a "mutual separation" from the company so Khalid would be offered severance pay "to ease the transition to [his] next employment." Khalid's salary range entitled him to six weeks of his base pay, and because his termination was due to a mutual separation, he received an additional five weeks of base pay – one week for each year he had worked at Citrix. In total, Khalid was offered $30,757, equaling eleven weeks of base pay. Before he signed the Severance

Agreement, Khalid sought more severance pay but was told Citrix's policy is to pay out based on the fixed formula.

Washington courts addressing when severance is "compensation" turn on whether the money is intended to replace wages that would otherwise be paid had the employee remained on the employer's payroll or is consideration for a contractual promise unrelated to the employee's salary or wages.[18] In Barrett v. Weyerhaeuser Co. Severance Pay Plan, 40 Wn. App. 630, 700 P.2d 338 (1985), an employee brought an action for severance pay under a written company severance pay plan. She claimed she was constructively discharged and remained entitled to severance pay despite the fact that she resigned from employment. At trial, the court found the employee had not proved her claim. Id. at 638. On appeal, this court explained the purpose of severance pay:

> Severance pay has been defined as terminal compensation measured by the service given during the subsistence of the contract, . . . payable on discharge from the employment, . . . according to the prescribed formula, a means of recompense for the economic exigencies and privations and detriments resulting from the permanent separation of the employee from service . . . In a real sense it is remuneration for the service rendered during the period covered by the agreement. Owens v. Press Pub. Co., 120 A.2d at 446. "[W]hile one of the objectives of . . . severance pay 'is to ease the employee's financial burden while looking for a new job,' such pay is also 'partial compensation for loss of seniority rights; loss of possible pension rights; [and] compensation for retraining or

---

[18] See Gaglidari v. Denny's Restaurants, Inc., 117 Wn.2d 426, 449-50, 815 P.2d 1362 (1991) (because "[l]ost wages damages [were] in lieu of compensation for services[,]" the statute included not only wages for work actually performed but also "money due by reason of employment."); McGinnity v. AutoNation, Inc., 149 Wn. App. 277, 284–85, 202 P.3d 1009 (2009) (unpaid vacation benefits constitute "an entitlement to compensation for services performed."); and Naches Valley Sch. Dist. No. JT3 v. Cruzen, 54 Wn. App. 388, 399, 775 P.2d 960 (1989) (unpaid sick leave also "an entitlement to compensation for services performed."). Tax liability resulting in a money judgment in an employment action is not wages. Peiffer v. Pro-Cut Concrete Cutting & Breaking Inc., 6 Wn. App. 2d 803, 827, 431 P.3d 1018 (2018) ("The increased tax liability that Mr. Peiffer incurred as a result of recovering his unpaid wages as a lump sum has none of the salient characteristics of a wage.")

> acquiring new skills; . . .'" Owens, 120 A.2d at 446, quoting Ackerson
> v. Western Union Telegraph Co., 234 Minn. 271, 48 N.W.2d 338, 25
> A.L.R.2d 1063 (Sup.Ct.1951).

Id. at 633.

The court held that severance benefits are payable according to the terms of the parties' contract regardless whether the employee claimed she was constructively discharged. Id. at 633-34. Because the plan only required the company to pay severance if it caused the termination, the plaintiff was not entitled to severance pay after she resigned. Id. at 638.

Although Barrett did not arise under RCW 49.48.030, this court relied on its discussion of the purpose of severance pay in ruling on a statutory wage claim in an unpublished opinion, Prichard v. Index Indus., Inc., noted at 123 Wn. App. 1060 (2004). In that case, two managerial employees had "written employment contracts specifying that notice payment (severance pay) would be paid upon their discharge, even if their employment contracts had expired, where the discharge was not for cause." Id. at *1. After they were fired, they requested notice pay and when the company refused, they brought suit. This court, citing Barrett, held that the severance pay was compensation under RCW 49.48.030 because "severance pay is a means of recompense for the economic exigencies, privations and detriments resulting from the permanent separation of the employee from service." Id. at *9.

We also followed this approach in Brooke v. Robinson, noted at 115 Wn. App. 1006 (2003), in which a written employment contract required the employer to provide two weeks' notice of termination and severance pay of $18,000 unless

the employee left to take work elsewhere. The employer terminated the agreement after it was signed but before the plaintiff began to work.

This court held that "severance pay is a bargained-for amount to be paid when employment is terminated through no fault of the employee." Id. at *2. It concluded that the plaintiff was entitled to attorney fees under RCW 49.48.030 because the wages she was owed during the two-week notice period was "clearly for money due by reason of employment." Id. at *4. Although the $18,000 severance pay was a "closer question," the court concluded:

> RCW 49.48.030 is interpreted broadly, and authorizes attorney fees when a judgment is obtained for any type of compensation due by reason of employment, including back pay, front pay, commissions, reimbursements for sick leave and pensions. Bates v. City of Richland, 112 Wn. App. 919, 940, 51 P.3d 816 (2002). Federal law also classifies severance pay as an employee benefit. See Boutillier v. Libby, McNiell & Libby, Inc., 42 Wn. App. 699, 710, 713 P.2d 1110 (1986) ('Severance pay, although not expressly set out in the language of 29 U.S.C. sec. 1002(1), also falls within the scope of ERISA as an employee welfare benefit plan'); Dhayer v. Weirton Steel Division of Nat'l Steel Corp., 571 F. Supp. 316, 329–30 (D.W.Va.1983). A severance award under an employment contract is properly characterized as compensation due by reason of employment. We therefore affirm the award of attorney fees.

In Bates v. City of Richland, 112 Wn. App. 919, 940, 51 P.3d 816 (2002), cited in Brooke, Division Three of this court held that pensions were "wages" as defined by RCW 49.48.030 because "awards for attorney fees under RCW 49.48.030 are not limited to judgments for wages or salary earned for work performed, but, rather, that attorney fees are recoverable under RCW 49.48.030 whenever a judgment is obtained for any type of compensation due by reason of employment. See also McGinnity v. AutoNation, Inc., 149 Wn. App. 277, 284, 202 P.3d 1009 (2009) (the rule is "if the employee gets the money on account of having

been employed, then the money is wages in the sense of compensation by reason of employment.") (quotations omitted).

Finally, in Dice v. City of Montesano, 131 Wn. App. 675, 128 P.3d 1253 (2006), a city employee signed an employment contract containing a termination clause that specified that if the city terminated him without cause it had to pay him a lump sum payment equal to three months' salary. Division Two of this court held that "it derives solely from [plaintiff's] employment contract with the [defendant]," which the plaintiff had entered at the beginning of the employment. Id. at 689.

> Here, the three months' salary due Dice constitutes "wages" because it derives solely from Dice's employment contract with the City and the amount was calculated according to his employment earnings at the time of discharge. An employee need not be currently employed to recover statutory attorney fees in a successful action against an employer for wages or salary. Bates, 112 Wn. App. at 940, 51 P.3d 816. Furthermore, the City's interpretation would suggest that an employer could refuse to pay bargained-for severance pay with impunity. The purpose of the attorney fee provision in RCW 49.48.030 is to allow an employee to protect his or her rightful wages and ensure payment. Bates, 112 Wn. App. at 939, 51 P.3d 816. Thus, the court did not err when it determined that, as the prevailing party, Dice was entitled to attorney fees under RCW 49.48.030.

Id. at 689–90.

Our state cases are consistent with federal law. In United States v. Quality Stores, Inc., 572 U.S. 141, 146, 134 S. Ct. 1395, 188 L. Ed. 2d 413 (2014), the U.S. Supreme Court held that severance payments were "wages" for the purposes of the Federal Insurance Contributions Act (FICA), which requires employers to pay taxes on wages in order to fund the Social Security Act and Medicare. FICA defines "wages" as "all remuneration for employment, including the cash value of

all remuneration (including benefits) paid in any medium other than cash." 26

U.S.C. § 3121(a). The court held that:

> [u]nder this definition, and as a matter of plain meaning, severance payments made to terminated employees are "remuneration for employment." Severance payments are, of course, "remuneration," and common sense dictates that employees receive the payments "for employment." Severance payments are made to employees only. It would be contrary to common usage to describe as a severance payment remuneration provided to someone who has not worked for the employer. Severance payments are made in consideration for employment—for a "service ... performed" by "an employee for the person employing him," per FICA's definition of the term "employment."

Quality Stores, Inc., 572 U.S. at 146.

Citrix contends no Washington court has examined our wage statutes in the context of a severance payment provided in a stand-alone agreement entered into after termination in exchange for new promises by the employee, rather than in exchange for work.[19] Citrix argues that it was not required to offer Khalid severance; rather, it suggests that it did so as a favor to Khalid "to assist [him] with the transition to new employment." But this argument is undermined by the language of the Severance Agreement itself and the testimony regarding how the company policy established the amount to which Khalid was entitled. Moreover, the company also explicitly informed Khalid that it would deduct payroll taxes and income tax withholding from the lump sum payment. If the severance pay was not intended to be "compensation by reason of employment," there would be no reason to deduct payroll or income taxes.

---

[19] Citrix relies primarily on cases from foreign jurisdictions or analysis of unrelated concepts such as unemployment compensation. We find none of these cases persuasive.

Citrix argues that the severance offered to Khalid was not "wages" because its purpose was to compensate Khalid for a release of liability, not for services he performed. Paragraph 7 of the Severance Agreement contained a broad release of claims against Citrix. Relying on Arzola v. Name Intelligence, Inc., 172 Wn. App. 51, 53, 288 P.3d 1154 (2012), Citrix contends where a "payment is designed to assist with transition and in exchange for a release, not in exchange for the employee's services or labor, it does not constitute 'wages.'" But Arzola did not involve a payment designed to transition an employee into a new position nor did it involve payment in exchange for a release.

In Arzola, three employees, when hired, received an allotted number of shares in the employer's company and were promised additional shares each subsequent year in which they received an average or above average performance rating. Id. at 53. The number of shares they received varied based on their performance ratings. Id. When the company decided to sell, it was required as a condition of that sale to buy back all outstanding stock rights the company had given to its employees. Id. Each employee agreed to execute a stock right cancellation agreement and to receive three cash payments and the option to purchase stock in the new company. Id.

The employer made the first payment to the employees. The compensation appeared on their W-2 forms as wages and the employees paid both federal income tax and Medicare tax on the full amount. Id. at 55. But a dispute then arose between the seller and buyer and the buyer filed suit to rescind the securities exchange agreement. Id. The employer did not make the second or third cash

payments to its employees, who brought suit for breach of the stock rights cancellation agreement. Id. The trial court held that the nonpayment constituted the unlawful withholding of wages under RCW 49.52.050 and awarded the employees double damages under RCW 49.52.070, and attorney fees under RCW 49.48.030. Id. at 56.

On appeal, this court reversed. It concluded that the cash payments under the stock rights cancellation agreement were not wages under RCW 49.48.030. Id. at 60. It reasoned that nothing required the employees to surrender their stock rights in exchange for the cash payments. Id. Once they agreed voluntarily to do so,

> the employees were in the same position as any other holder of stock – able to freely sell those rights, regardless of how they were originally obtained. The consideration the employees provided under the SRCs was not service or labor but, rather, surrender of their proprietary interest in the company stock. The monies paid for the cancellation of the stock rights cannot be said to transform into wages, simply because the existence of either the stock or the SRC is a by-product of the employment relationship.

Id. at 59. This court did not find compelling the argument that the employer had withheld taxes from the first cash payment, concluding that "[n]othing in the record allow[ed] us to determine whether the tax code was properly applied." Id. at 60.

Citrix's reliance on Arzola is misplaced. It is true that Khalid did not have to sign the Severance Agreement. But Citrix had a company policy of paying severance pay to departing employees based on the length of the employees' service. The sole reason the severance was to be paid was because Khalid had worked for the company as long as he did. And the payment to Khalid was

calculated according to his base salary. Thus, the payment is much more akin to wages than the stock cancellation right payment in Arzola.

While it is also accurate that the Severance Agreement contained a release of liability to which Citrix would not otherwise have been entitled, the facts of this case are unique in that Citrix chose not to enforce this release when it chose not to pay Khalid the compensation it promised to pay under Paragraph 2.

This case is more like Brooke and Bates than Arzola. Citrix offered severance payments only to employees; they are not available to the greater public, as was the stock in Arzola. And the nexus between the severance payments and the employment relationship is made clear by the fact that the amount of the payments are governed by the base salary Citrix pays the employee and duration of the employee's tenure with Citrix. Moreover, the payment offered to Khalid was akin to "recompense for the economic exigencies and privations and detriments resulting from the permanent separation of the employee from service." Based on this court's prior cases and the evidence presented at trial, the trial court did not err in concluding that the severance pay awarded by the jury constituted wages under RCW 49.48.030, thereby entitling Khalid to an award of attorney fees.

12. Citrix's Challenges to the Amount of the Attorney Fees

Citrix next challenges the amount of attorney fees the trial court allowed, arguing the trial court erred in permitting Khalid to recover attorney fees for unsuccessful claims and erred in applying a lodestar multiplier in this case. We reject both arguments.

Under Florida law, when successful and unsuccessful claims share a "common core" of facts and "related legal theories," a party entitled to an award of attorney fees for work on the successful claims is entitled to its fees for work on all of his claims. Chodorow v. Moore, 947 So. 2d 577, 579 (Fla. Dist. Ct. App. 2007). Issues involve a common core of facts when "work for one claim cannot be distinguished from work on other claims." Miller v. Miller, 107 So. 3d 430, 433 (Fla. Dist. Ct. App. 2012). Where the claims involve a common core of facts, "a full fee may be awarded unless it can be shown that the attorneys spent a separate and distinct amount of time on counts as to which no attorney's fees were sought." Anglia Jacs & Co., Inc. v. Dubin, 830 So. 2d 169, 172 (Fla. Dist. Ct. App. 2002).[20] The party seeking fees bears the burden to either allocate fees to the issues for which fees may be awarded, or to demonstrate "that the issues were so intertwined that allocation is not feasible." Lubkey v. Compuvac Sys., Inc., 857 So. 2d 966, 968 (Fla. Dist. Ct. App. 2003). We review the trial court's common core findings to determine if they are supported by competent, substantial evidence. Country Manors Ass'n, Inc. v. Master Antenna Sys., Inc., 534 So. 2d 1187, 1192-93 (Fla. Dist. Ct. App. 1988).

Khalid prevailed on his two contract claims but the jury rejected the remainder of Khalid's claims, including his breach of implied covenant of good faith and fair dealing claims, CPA claim, and tortious interference claims. In evaluating whether

---

[20] Washington also utilizes the common core theory. See, e.g., Bright v. Frank Russell Invs., 191 Wn. App. 73, 79, 361 P.3d 245 (2015) ("when a plaintiff prevails and the claims 'involve a common core of facts or . . . related legal theories,'" the fee award need not be reduced because the prevailing party did not prevail on all claims.) (Quoting Hensley v. Eckerhart, 461 U.S. 424, 435, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983).

Khalid was entitled to attorney fees incurred in prosecuting unsuccessful claims, the trial court found Khalid's implied covenant of good faith and fair dealing claim was "an alternate legal theory applied to the same facts" as his breach of contract claims. In the case of Xencare's claim for tortious interference with business expectancy, the trial court found the key element of improper purpose or improper means was based on the breach of the Confidentiality Agreement, and Xencare's expectancies were the same business opportunities addressed in Khalid's damage claim. Finally, the trial court found that Khalid's successful defense against Citrix's counterclaims for breach of the Employment Agreement was inextricably intertwined with Khalid's breach of contract claim for breach of the same agreement.[21] Based on these findings, it awarded Khalid attorney fees incurred to prosecute all of his claims and to defend all of Citrix's counterclaims in the lawsuit. We conclude these findings are supported by substantial evidence in the record.

Citrix contends the trial court incorrectly applied Florida's common core theory. Citing Chastain v. Chastain, 119 So. 3d 547, 551 (Fla. Dist. Ct. App. 2013), Citrix argues that even if claims "involved a common core of facts, a full fee on claims involving a common set of facts may not be awarded if it can be shown that the attorneys spent a separate and distinct amount of time on counts as to which no attorney's fees were sought or authorized." Citrix identifies three billing entries that it asserts are not compensable: (1) a January 21, 2017 entry for "legal research regarding good faith and fair dealing" (billed at $750); (2) a January 22, 2017 entry

---

[21] According to Khalid, his fee request excluded time spent on (1) Citrix's Lanham Act claims, (2) his request for punitive damages, and (3) researching tortious interference. The trial court did not award fees for the time Khalid's attorneys spent defending Citrix's trademark infringement claim. ("Plaintiffs have deleted all the hours spent on Trademark liability before trial.").

for "legal research pertaining to Florida tortious interference and CPA claims" (billed at $4150), and (3) a May 12, 2018 entry for time spent responding to Citrix's counterclaims (billed at $1050). Citrix argues that these entries were clearly capable of segregation and that this non-exclusive list of errors demonstrates the trial court "engaged in only part of the required analysis."

With regard to the first two entries, we agree with Citrix that these entries related solely to legal research on unsuccessful claims and do not relate to a common core of facts. The trial court erred in awarding $4,900 and the attorney fee award should be adjusted on remand accordingly.

But the trial court did not err in awarding attorney fees for time spent responding to Citrix's counterclaims. The trial court found:

> Citrix counterclaimed for breach of the Confidentiality Agreement. Argument and testimony at trial demonstrated that this included allegations of violation of Section 8, the provision authorizing award of fees and costs. Khalid's successful defense against that claim involved proof that he had done all, or substantially all, of the essential things required of him under the Confidentiality Agreement, which was also part of his own claim for breach of the Confidentiality Agreement. See Jury Instruction Nos. 15 and 51. Citrix argued that it was not required to perform under the Confidentiality Agreement unless Khalid complied with a condition precedent – assigning the patents to Citrix – so Khalid's success on this claim also involved the same common core of facts underlying his claim for breach of the Confidentiality Agreement. See Jury Instruction No. 19.
> . . . .
> Citrix counterclaimed for breach of the Severance Agreement. Khalid's successful defense against that claim involved proof that he had done all, or substantially all, of the essential things required of him under the Agreement, which was also part of his own claim for breach of the Confidentiality Agreement. See Jury Instruction Nos. 17 and 53.

The trial court held that while Khalid was not entitled to fees on the liability portion of Citrix's trademark claim, he was entitled to fees defending Citrix's request for trademark infringement damages.

> Citrix also counterclaimed for trademark infringement. Citrix sought damages in the form of disgorged profits. Citrix sought to disgorge the entirety of Khalid's lost profits damages awarded for breach of the Confidentiality Agreement. Plaintiffs have deleted all the hours spent on Trademark liability before trial. But, Khalid's successful defense of Citrix's damage claim involved a "common core" of facts that cannot be separated from proof of breach of contract.

Citrix does not specifically challenge any of these findings and we accept them as verities on appeal. With the exception of the $4,900 identified above, the trial court's unchallenged factual findings support its legal conclusions regarding Khalid's entitlement to his full attorney fee award under Florida law.

Finally, Citrix contends the trial court erred in applying a lodestar multiplier to Khalid's attorney fee award. We conclude the trial court did not abuse its discretion in applying a 1.75 multiplier in this case.

In calculating attorney fees, Florida uses the lodestar approach, which is calculated by the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. Florida Patient's Compensation Fund v. Rowe, 472 So. 2d 1145, 1150-51 (Fla. 1985). Factors to be considered in determining what constitutes a reasonable attorney fee include:

> (1) The time and labor required, the novelty and difficulty of the question involved, and the skill requisite to perform the legal service properly.
> (2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.
> (3) The fee customarily charged in the locality for similar legal services.
> (4) The amount involved and the results obtained.

> (5) The time limitations imposed by the client or by the circumstances.
> (6) The nature and length of the professional relationship with the client.
> (7) The experience, reputation, and ability of the lawyer or lawyers performing the services.
> (8) Whether the fee is fixed or contingent.

Id. at 1150. Florida provides for adjustments to the lodestar in cases in which the prevailing party's counsel is employed on a contingency fee basis.[22] Id. at 1151. Florida courts consider three factors when determining whether a contingency fee multiplier is appropriate in a breach of contract case:

> (1) whether the relevant market requires a contingency fee multiplier to obtain competent counsel; (2) whether the attorney was able to mitigate the risk of nonpayment in any way; and (3) whether any of the factors in Rowe are applicable, especially the amount involved, the results obtained, and the type of fee arrangement between the attorney and his client.

Joyce v. Federated Nat'l Ins. Coverage, 228 So. 3d 1122, 1128 (Fla. 2017) (citing Standard Guar. Ins. Co. v. Quanstrom, 555 So. 2d 828, 834 (Fla. 1990)). "If the trial court determines that success was more likely than not at the outset, it may apply a multiplier of 1 to 1.5; if the trial court determines that the likelihood of success was approximately even at the outset, the trial judge may apply a multiplier of 1.5 to 2.0; and if the trial court determines that success was unlikely at the outset of the case, it may apply a multiplier of 2.0 to 2.5." Quanstrom, 555 So. 2d at 834.

This court reviews a trial court's decision to award a multiplier for an abuse of discretion. Bowers v. Transamerica Title Ins. Co., 100 Wn.2d 581, 599, 675

---

[22] Khalid argues that "[a] multiplier may be awarded under both Washington and Florida law because Khalid prevailed on fee claims under both states' laws." Because the parties do not argue that there is any difference in methodology under Florida or Washington law, we need not address this issue.

- 92 -

P.2d 193 (1983); <u>Hill v. Garda CL Nw., Inc.</u>, 198 Wn. App. 326, 368 P.3d 390

(2017); <u>rev'd on other grounds</u>, <u>Hill v. Garda CL Nw., Inc.</u>, 191 Wn.2d 553, 424

P.3d 207 (2018).

Here, the trial court applied a contingency fee multiplier of 1.75, in light of the

complexity of the litigation and the questionable probability that Khalid would prevail.

The trial court articulated the basis for its attorney fee award as follows:

> There was no clear likelihood of success at the outset of this litigation and there were substantial risks of nonrecovery. Citrix had asserted a multitude of affirmative defenses all of which might have resulted in the dismissal of the case on motions practice or have been accepted by the jury. There were challenging factual issues underlying the central claims including the clarity of the disclosures made by Khalid on Exhibit B to the confidentiality agreement, the complicated history of Khalid's presentations of his inventions at the work-site, whether Khalid had complied with the disclosure requirements of the Confidentiality Agreement regarding his employment, whether he had adequately preserved for himself the right to continue working on his inventions while at Citrix, whether his inventions were based on input of Citrix personnel, whether Citrix's actions in asserting ownership of the contested patents were responsible for any damages suffered by Khalid and the extent of any such damages, a matter which was going to be the subject of disputed expert testimony. Overlaying these specific challenges were generalized allegations regarding the credibility of Mr. Khalid and the likely presumption that a sophisticated corporation such as Citrix would handle matters such as those at issue in this case properly.
>
> The likelihood at the outset of this case of the success actually achieved at trial is appropriately characterized as less than even.

Citrix argues that Khalid failed to establish the first <u>Quanstrom</u> factor – that a

contingency fee multiplier was required to obtain competent counsel. It argues that

Khalid had a pre-existing relationship with one of his attorneys, which "weighs against

the award of a lodestar multiplier."

The record does not support Citrix's assertion. Khalid filed a declaration from one of his attorneys, Stephen Connor, which contains a lengthy analysis of the risk factors his law firm assessed when it decided to represent Khalid on a contingency fee basis. Connor stated that the case "was a highly risky undertaking" and that "[a]t the outset of the case it appears that the likelihood of the success was less than even" because of Citrix's multitude of affirmative defenses, the challenging factual issues presented, and "the likely presumption that a sophisticated corporation such as Citrix would not improperly handle these types of matters." Connor stated that the litigation had consumed a substantial portion of his firm's resources for a year and a half and had caused the firm to decline other work. According to Connor, his firm was only willing to the take the case "because of the prospect of receiving a contingent fee multiplier."

Khalid also presented the declaration of an expert witness, David Breskin, an experienced trial lawyer in King County. Breskin stated that "[t]he availability of a risk multiplier incentivizes firms like those representing Mr. Khalid in this action to accept cases on a contingency fee basis and provide representation when the case poses significant risk at the outset of no recovery at all, the issues are complex factually and legally, and the case is likely to be hotly contested and the resolution of the case is likely to be far off." Breskin opined that the risk involved in this case justified the application of a multiplier.

Substantial evidence demonstrated that the case presented a large amount of risk to a law firm and the promise of a fee multiplier was necessary in order to find counsel willing to devote the necessary time and resources to it, in light of the fact

that the firm would likely have to decline other work. Consequently, the trial court's application of a multiplier was not an abuse of discretion.

13. Attorney Fee Award to Citrix under the Lanham Act, 15 U.S.C. §117(a)

Khalid argues that the trial court erred in awarding Citrix attorney fees under the Lanham Act because Citrix failed to prove it sustained any damages and sought no injunctive relief. We agree. Although the trial court entered an order of partial summary judgment in favor of Citrix, that order did not render Citrix the prevailing party because it did not award Citrix any concrete relief and thus did not change the legal relationship of the parties in any material way.

An appellate court reviews a trial court's decision to award attorney fees under the Lanham Act for abuse of discretion. Stephen W. Boney, Inc. v. Boney Servs., Inc., 127 F.3d 821, 825 (9th Cir. 1997). However, whether Citrix was the prevailing party is a question of law reviewed de novo. Lorillard Tobacco Co. v. Engida, 611 F.3d 1209, 1214 (10th Cir. 2010).

The attorney fee provision of the Lanham Act states: "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a)(3). Although the parties disagree who the prevailing party is in this case, both parties agree the issue is controlled by Buckhannon Bd. and Care Home, Inc. v. W. Va. Dep't of Health & Hum. Res., 532 U.S. 598, 121 S. Ct. 1835, 149 L. Ed. 2d 855 (2001).

In Buckhannon, the Supreme Court considered whether a party can be deemed a "prevailing party" for purposes of a fee award if that party has obtained neither a judgment on the merits nor a court-ordered consent decree. Id. at 600.

In that case, assisted living facilities operated by Buckhannon Board and Care Home Inc. ("Buckhannon") failed an inspection by the West Virginia Office of the State Fire Marshal because some of the residents were "incapable of self-preservation" under state law. Id. After the state issued a cease-and-desist order requiring the facilities to close, Buckhannon sued the state in federal court, seeking declaratory and injunctive relief that the state "self-preservation" inspection requirement violated the Fair Housing Amendments Act ("FHAA") of 1988, 42 U.S.C. § 3601, and the American with Disabilities Act ("ADA") of 1990, 42 U.S.C. § 12101. Id. at 600-01.

While the case was pending, the West Virginia legislature eliminated the "self-preservation" requirement and the State moved to dismiss the case as moot. Id. at 601. The federal court granted the motion, concluding the legislation eliminated the allegedly offensive provisions and there was no indication the state legislature would repeal the amendments. Id.

Buckhannon then requested attorney fees as the prevailing party under the FHAA and ADA. Id. at 601. Buckhannon argued it was the prevailing party because the lawsuit was the "catalyst" that brought about a voluntary change in the State's conduct. Id. The Supreme Court rejected that argument. First, it held that the term "prevailing party" is a legal term of art, meaning "[a] party in whose favor judgment is rendered, regardless of the amount of damages awarded." Id. at 603 (quoting BLACK'S LAW DICTIONARY 1145 (7th ed. 1999)). Second, it surveyed prior case law and concluded that the ordinary meaning of the phrase "prevailing party" means the claimant received "at least some relief on the merits of his claim."

Id. The relief can be a judgment on the merits or a consent decree—but needs to be some type of court order that "chang[es] the legal relationship between [the plaintiff] and the defendant." Id. at 604 (quoting Texas State Teachers Ass'n v. Garland Indep. Sch. Dist., 489 U.S. 782, 792, 109 S. Ct. 1486, 103 L. Ed. 2d 866 (1989)). A defendant's voluntary change in conduct, although accomplishing what the plaintiff sought to achieve in the lawsuit, "lacks the necessary judicial imprimatur on the change." Buckhannon, 532 U.S. at 605. See also Farrar v. Hobby, 506 U.S. 103, 111-13, 113 S. Ct. 566, 121 L. Ed. 2d 494 (1992) (plaintiff must obtain either an enforceable judgment against defendant or comparable relief through consent decree but the relief must "directly benefit" him at the time of the judgment or consent decree).

The question presented by this appeal is whether a partial summary judgment order on the merits, in which the court found that Khalid knowingly infringed Citrix's trademark in violation of the Lanham Act, is a sufficient judicially mandated change in the legal relationship between the parties in the absence of a final judgment on the merits or a permanent injunction in Citrix's favor. In this case, Citrix established liability but failed to prove either causation or damages and sought neither preliminary nor permanent injunctive relief.

The most analogous case we can find is Thomas v. Nat'l Sci. Found., 330 F.3d 486 (D.C. Cir. 2003), in which a federal appellate court considered whether a preliminary injunction and partial summary judgment changed the legal relationship in a way that afforded the plaintiffs the relief they sought, as required by Buckhannon. In that case, internet domain name registrants sued the National

Science Foundation (NSF) and a private company that operated NSF's domain registration system under a cooperative agreement, alleging that fees collected by NSF and shared with the private company constituted an illegal tax. Id. at 488. The district court held on partial summary judgment that a portion of the fees were a tax not imposed or ratified by Congress in violation of article 1, section 8 of the Constitution. Id. It issued a preliminary injunction temporarily barring NSF from spending any money collected. Id.

Before final judgment, Congress passed a law legalizing and ratifying the registration fee, rendering Thomas's claims moot. Id. The district court vacated the preliminary injunction and dismissed the case. Id. Thomas then sought an award of attorney fees under the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A). The district court granted the motion, concluding that they were prevailing parties because they had succeeded in obtaining a preliminary injunction and partial summary judgment. Id.

The U.S. Court of Appeals for the District of Columbia reversed and concluded that neither the preliminary injunction nor the partial summary judgment changed the relationship between Thomas and NSF "in a way that afforded [Thomas] the relief that they sought." Id. at 493. The preliminary injunction at issue in that case merely preserved the status quo pending final adjudication. And when NSF moved to dismiss the case as moot, the court vacated that preliminary injunction. Id. Thus, it did not change the parties' legal relationship as requested in the lawsuit.

With regard to the partial summary judgment, the order declared the disputed assessment was an unconstitutional tax but "did not afford [Thomas] any concrete relief, beyond this mere legal declaration." Id. at 493. Under Backhannon, the court stated, a "judicial decree" is not enough to warrant a fee award, because it represents "not the end but the means" of the litigation. Id. at 494 (quoting Hewitt v. Helms, 482 U.S. 755, 760, 107 S. Ct. 2672, 96 L. Ed. 2d 654 (1987)). A declaration must require "some action (or cessation of action) by the defendant that the judgment produces – the payment of damages, or specific performance or the termination of some conduct." Id. Because the partial summary judgment did not achieve such results, it could not justify an award of fees in the case. Id.

The Ninth Circuit, like the D.C. Circuit, requires proof that the claimant received some type of relief from the court before that claimant becomes a prevailing party. In Benton v. Oregon Student Assistance Comm'n, 421 F.3d 901, 908 (9th Cir. 2005), the appellate court reversed attorney fees awarded to a college professor because the district court's conclusion that the professor's constitutional rights had been violated and its award of $1 in nominal damages were insufficient to justify fees when the professor had not obtained a declaratory judgment in her favor. In Poland v. Chertoff, 494 F.3d 1174, 1187 (9th Cir. 2007), the court denied prevailing party status to a plaintiff who had established one of his claims but had not obtained any relief on the merits of his claims. And in Citizens for Better Forestry v. U.S. Dep't of Agric., 567 F.3d 1128 (9th Cir. 2009), the court of appeals reversed a fee award because, although the appellate court ruled in the plaintiff's

favor on the merits of a legal claim, it did not order the entry of a declaratory judgment: "a court is not bound to enter a declaratory judgment when it finds unlawful action." Id. at 1133. See also M.L. v. Federal Way Sch. Dist., 401 F. Supp. 2d 1158, 1163 (W.D. Wash. 2005) (parents entitled to fee award as prevailing party because the partial summary judgment conferred on parents the legal right to compel the school district to convene new IEP team, a right they did not possess before commencing federal action).

In this case, the partial summary judgment order resolved an issue of fact and decided that Khalid had knowingly infringed Citrix's mark. Under CR 56(d), trial courts are authorized to examine the evidence before it and ascertain what facts appear to be without controversy. It further allows a trial court to reserve disputed issues for trial. The trial court did so here by identifying the undisputed material facts regarding Khalid's knowledge of Citrix's trademark, its strength, the likelihood Khalid's use of the mark was to cause consumer confusion, and Khalid's infringement of it. It reserved for trial whether Citrix was entitled to any damages. Citrix did not seek or obtain a permanent injunction or any court order requiring Khalid to cease using the mark. Because the trial court's partial summary judgment order did not grant Citrix any relief, the partial summary judgment order was a judicial decree of undisputed facts but not a court order compelling Khalid to refrain from any use of the mark.

Citrix relies on two cases to support its contention that it was the prevailing party on the Lanham Act claim. Those cases, however, are distinguishable. In Leatherman Tool Group, Inc. v. Cooper Indus., Inc., 1998 WL 349554, *2 (D. Or.

Mar. 5, 1998), while the jury awarded no damages to the trademark holder, the court had already entered an injunction against the infringer. Because an injunction is an enforceable court order, the trademark holder was the prevailing party entitled to attorney fees. The trial court here entered no injunctive relief.

In Manufacturers Techs., Inc. v. Cams, Inc., 728 F. Supp. 75, 85 (D. Conn. 1989), the district court found the defendant violated the plaintiff's copyrights and awarded $348,538 in actual damages. Id. at 83. It had previously found the defendant violated the Lanham Act by falsely designating the origin of its software. Id. at 85, citing Manufacturers Techs., Inc. v. Cams, Inc., 706 F. Supp. 984, 1003-04 (D. Conn. 1989). But it found the plaintiff failed to prove consumers were deceived by the violation, a prerequisite to an award of damages under a false advertising claim under the Lanham Act. Id. 85. As to the plaintiff's second Lanham Act claim, false designation of origin, the court found the defendant had deceived or confused at least one consumer. Id. But it found that any damages incurred as a result of this Lanham Act violation had been "fully accounted for in the court's award for damages on account of copyright infringement" and it declined to award further damages under the Lanham Act. Id. The court reasoned that "[t]o compensate plaintiff for this claim would be to grant it a double recovery." Id.

The plaintiff sought attorney fees under 15 U.S.C. § 1117(a), arguing that all of its fees, including the fees incurred in prosecuting the copyright claims, were recoverable under the Lanham Act. Id at 86. The court held that it would award attorney fees to the plaintiff because the defendant's actions were willful, making

it an exceptional case under 15 U.S.C. § 1117(a), but it declined to award those fees attributable to proving the copyright infringement claim. Id. at 85-86. There was no discussion why the plaintiff was found to be a prevailing party; it is unclear from the decision if the issue was even litigated by the parties.

Nevertheless, the case is distinguishable because the court would have awarded damages to the plaintiff but for the fact its damages had already been compensated through the duplicative award for copyright infringement. Here, unlike Manufacturers Techs, there is nothing in the record to support the contention that the jury refused to award Citrix damages on its Lanham Act claim because it had already awarded compensatory damages to Citrix on a different cause of action. Citrix failed to prevail on a single claim it asserted against Khalid. Consequently, the trial court erred in awarding fees. We remand to the trial to strike the attorney fee award in favor of Citrix.

14. Attorney Fees on Appeal

Khalid requests attorney fees and costs on appeal pursuant to RAP 18.1, which provides that a party may recover attorney fees on appeal if such fees are allowed by law and the party devotes a section of its opening brief to the request. Citrix does not address Khalid's request for fees. Attorney fees on appeal are recoverable on the same grounds they were recoverable below. Because Khalid is the substantially prevailing party on appeal, we award him reasonable attorney fees and costs incurred on appeal, subject to compliance with RAP 18.1.

Affirmed in substantial part, and reversed in part and remanded to award prejudgment interest to Khalid on the $3 million jury award from the date of

Barrick's December 2016 damages report to the date of judgment, to reduce

Khalid's attorney fee award by $4,900, and to vacate Citrix's Lanham Act attorney

fee award.

_Andrus, A.C.J._

WE CONCUR:

_Mann, C.J._                _____